**UNITED STATES of America, Appellee,**

v.

**Richard BOOTHE, Frank Frigenti, Sr., and Frank Frigenti, Jr., Defendants–Appellants.**

Nos. 485, 568 and 1090, Dockets 92–1271(L), 92–1285 and 92–1286.

United States Court of Appeals, Second Circuit.

Argued March 16, 1993.

Decided May 19, 1993.

64

William Gurin, Asst. U.S. Atty., Brooklyn, NY (Mary Jo White, U.S. Atty., E.D.N.Y., Peter A. Norling, Asst. U.S. Atty., of counsel), for appellee.

Colleen P. Cassidy, New York City (The Legal Aid Soc., Federal Defender Services Appeals Unit, of counsel), for appellant Richard Boothe.

Barbara L. Hartung, New York City, for appellant Frank Frigenti, Sr.

Arthur J. Viviani, Flushing, NY, for appellant Frank Frigenti, Jr.

Before ALTIMARI, LUMBARD and LOKEN,* Circuit Judges.

LUMBARD, Circuit Judge:

Defendants Richard Boothe, Frank Frigenti, Sr., and Frank Frigenti, Jr. appeal from judgments of conviction entered on April 29, 1992 after a jury trial in the Eastern District of New York, Pratt, *C.J.*, sitting by designation. All three defendants were convicted of conspiracy to counterfeit United States currency, in violation of 18 U.S.C. § 371 (1988). Boothe and Frigenti, Sr. were also convicted of counterfeiting, 18 U.S.C. § 471 (1988), and possession of counterfeit currency and plates used to counterfeit currency, 18 U.S.C. § 474 (1988). Boothe, Frigenti, Sr., and Frigenti, Jr. were sentenced to terms of imprisonment of 56, 78, and 48 months, respectively, each term to be followed by three years of supervised release. Special assessments were also imposed.

Frigenti, Jr. argues that: the government knowingly used false and misleading testimony against him; his trial counsel was ineffective; the instruction on "conscious avoidance" was improper; and the evidence was insufficient to support his conviction. In addition, all three defendants contend that the district court erred in calculating their sentences under the Sentencing Guidelines. We affirm.

On February 27, 1991, a man who identified himself as "Richie" of the Arby Printing Company telephoned the Lindenmyre–Munroe Paper Company in Queens and ordered ten cartons of Strathmore bond paper. Later that day, "Richie" and another man arrived at Lindenmyre, paid for the order in cash, and said they would return to pick up the paper. His suspicion aroused by this all-cash sale to an unknown customer, a Lindenmyre sales manager alerted the United States Secret Service.

Unable to confirm the existence of an Arby Printing Company at the address and telephone number given to Lindenmyre by "Richie," Secret Service agents set up surveillance of Lindenmyre and placed undercover agents on its loading dock. On March 1, a white van occupied by Boothe and Frigenti, Jr. arrived at Lindenmyre. Boothe exited the van and showed the receipt for the paper ordered by "Richie" to one of the undercover agents. Boothe and the agent loaded the ten cartons of paper, each of which was labeled with the name of the manufacturer and the type of paper, into the van. Frigenti, Jr. then drove the van away.

Agents following the van observed it stop on a side street, where Frigenti, Jr. replaced the license plates with another set of plates. Both sets of plates were registered to apparently fictitious individuals. Frigenti, Jr. then drove the van onto the Long Island Expressway and headed east. Rather than remaining on the main road of the expressway, Frigenti, Jr. drove the van alternately on the main road, the service road, and along parallel side streets, his route bearing no apparent connection to prevailing traffic conditions. At one point, Frigenti, Jr. simply stopped the van on the service road and waited.

The van eventually arrived at Boothe's Holbrook, Long Island residence, where one man exited and went into the house. The van then continued to the Frigentis' home in Shirley, Long Island, where the paper was unloaded and stored in the garage.

---

* Hon. James B. Loken, Circuit Judge, for the U.S. Court of Appeals for the Eighth Circuit, sitting by designation.

Agents kept the Frigentis' garage under constant surveillance until March 8, when they saw the paper being loaded into a blue van which bore the name of a carpet service. With Frigenti, Sr. and Boothe inside, the van left the garage and headed west on the Long Island Expressway. Driving a Lincoln Continental, Frigenti, Jr. followed the van onto the expressway and then drove both in front of and behind it, periodically looking into the windows of surrounding cars. Frigenti, Jr. exited the expressway near the Nassau County border.

The van continued to Manhattan's Little Italy, where Frigenti, Sr. and Boothe met Douglas Salavec, a printer then employed by the Raleigh Lithograph Company. The three men then proceeded to 100 Avenue of the Americas where they moved the paper to Raleigh's offices on the seventh floor. From vantage points on nearby rooftops, agents observed the printing of thousands of sheets of counterfeit twenty-dollar bills. After obtaining a search warrant by telephone, agents entered Raleigh's offices and arrested Boothe, Frigenti, Sr. and Salavec. They seized over $10 million in newly printed currency, as well as plates, blankets, and maskings used in the printing process.

At trial, the government introduced the counterfeit currency, the plates and other materials used in the printing operation, photographs and videotapes made in connection with the surveillance, and the receipt for the paper which had been recovered from Boothe's home. The government offered the testimony of: the Lindenmyre employees involved in the sale of the paper; the agents involved in the undercover operation and surveillance; an expert in the examination and detection of counterfeit currency; and Salavec, who testified pursuant to a cooperation agreement with the government.

Before Salavec took the stand, the government advised the court and defense counsel that Salavec, who had earlier identified Boothe and Frigenti, Sr. as his known accomplices, refused to name them before the jury. Frigenti, Jr.'s counsel stated that he was aware, from material previously received from the government, that his client had never met with or spoken to Salavec. Con-

firming this, the government stated that Salavec, if asked, would testify that he had no dealings with Frigenti, Jr., a fact to which the government offered to stipulate.

Salavec then testified that he had several conversations and meetings with two men during which he agreed to help them print counterfeit currency in exchange for $2,000. He described how he created a set of plates and used them to print the counterfeit twenty-dollar bills. He stated that when he was arrested on March 8, 1991, he and his two accomplices had just finished printing the currency found in Raleigh's offices.

Before cross-examining Salavec, Frigenti, Jr.'s counsel told the court:

> MR. HAUSCH: Your Honor, my intention is to ask the witness if my client had any— took part in any of the conversations or meetings that they had relating to this. My client has instructed me not to ask that question. I feel bound by his decision in this matter. He certainly knows more about the underlines [sic] of this case than I do. It is my client's decision and I intend to abide by it.

Trial Tr. at 318. Concerned that Frigenti, Jr. might claim ineffective assistance of counsel on appeal, the court called Frigenti, Jr. to the bench, whereupon the following colloquy took place:

> MR. HAUSCH: I have discussed with my client my proposed questions of this witness, which would be in effect, did my client, Mr. Frigenti, Jr. participate in any of the conversations you had with respect to the counterfeiting of money. My client instructed me not to ask that question based upon all the information he has about that case; is that correct?
>
> FRIGENTI, JR.: Yes.
>
> MR. HAUSCH: That's the way you wish me to proceed?
>
> FRIGENTI, JR.: Yes.
>
> THE COURT: You have had a thorough discussion with counsel?
>
> FRIGENTI, JR.: It seemed like enough time. Yes, we had a discussion. And it is my decision.

THE COURT: And your instructions were to your attorney not to inquire as to whether you were among the people who were present in any of the meetings that Mr. Salavec has testified to?

FRIGENTI, JR.: Yes.

MR. GURIN [the prosecutor]: For the record, could the court inquire as to whether Mr. Frigenti, Jr. is making the decision of his own free will or whether he was coerced or approached in any fashion to make the decision, just for the record?

FRIGENTI, JR.: My own free will.

THE COURT: You understand that the overall evaluation of the case by the jury, your position might be strengthened if this witness were to say that you were not present at any of the meetings.

FRIGENTI, JR.: I wasn't.

THE COURT: But you still don't want your attorney to ask that question?

FRIGENTI, JR.: No.

THE COURT: That's your decision.

*Id.* at 318–20. Frigenti, Jr.'s counsel did not cross-examine Salavec at all.

Frigenti, Sr. and Boothe did not present any evidence. Frigenti, Jr. called one witness, his cousin Michael Cucuzzo, who testified that: he owns the van used to transport the paper to Manhattan on March 8; he lent the van to Frigenti, Sr. at Frigenti, Sr.'s request; Frigenti, Sr. asked him to help load the cartons of paper into the van, and he did so; he did not know the contents of the cartons; and he and Frigenti, Jr. followed the van on the Long Island Expressway because Cucuzzo was worried that one of the van's tires might go flat.

The jury convicted the three defendants on all counts.

## A. USE OF FALSE AND MISLEADING TESTIMONY

. ██ Due process bars a prosecutor from making knowing use of false evidence, *see United States v. Valentine*, 820 F.2d 565, 570–71 (2d Cir.1987), and a conviction may not stand if such evidence " 'could . . . in any reasonable likelihood have affected the judgment of the jury . . . .' " *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972) (quoting *Napue v. Illinois*, 360 U.S. 264, 271, 79 S.Ct. 1173, 1178, 3 L.Ed.2d 1217 (1959)). Frigenti, Jr. argues that his conviction must be reversed because the government elicited testimony from Salavec, knowing that Salavec's failure to name his accomplices would leave the jury with the false impression that Frigenti, Jr. was one of the two men with whom Salavec met and planned the counterfeiting operation. We disagree.

From material disclosed by the government, Frigenti, Jr. was aware that Salavec had previously identified Boothe and Frigenti, Sr. as his known accomplices. Upon disclosing that Salavec would not repeat this identification before the jury, the prosecutor stated that Salavec would testify, if asked, that Frigenti, Jr. was *not* one of his accomplices. Thus, Frigenti, Jr. was in possession of sufficient information to avoid the prejudice he now complains of; he need only have asked Salavec whether he was one of the men with whom he had met and planned the counterfeiting scheme. But Frigenti, Jr. barred his attorney from asking that question, despite the court's explanation that Salavec's answer might strengthen his position with the jury. Having made this deliberate strategic decision, Frigenti, Jr. waived his right to complain that the jury was misled by Salavec's testimony.

██ We also reject Frigenti, Jr.'s claim that the government improperly capitalized on the misleading nature of Salavec's testimony on summation. The prosecutor never suggested to the jury that Salavec had identified any of the defendants, let alone Frigenti, Jr., but merely argued that the totality of the evidence supported the inference that the defendants were Salavec's co-conspirators. This argument was well within the broad latitude which both the prosecutor and defense counsel are afforded during closing arguments. *See United States v. Smith*, 778 F.2d 925, 929 (2d Cir.1985).

## B. INEFFECTIVE ASSISTANCE OF COUNSEL

██ Frigenti, Jr. contends that his trial counsel rendered ineffective assistance by failing to object to Salavec's testimony as

hearsay, move to strike that testimony as false, or move for a severance or a mistrial. Because each of these motions would have been frivolous, Frigenti, Jr. has not shown that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).

■ First, the conversations related by Salavec on direct examination were not hearsay because they were "statement[s] by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed. R.Evid. 801(d)(2)(E). This is true despite the fact that Salavec had not identified his co-conspirators by name. *See United States v. Cruz,* 910 F.2d 1072, 1081 n. 10 (3d Cir. 1990) (statement may be non-hearsay within meaning of Rule 801(d)(2)(E) even though declarant is unidentified), *cert. denied,* 498 U.S. 1039, 111 S.Ct. 709, 112 L.Ed.2d 698 (1991). Second, Salavec's testimony could not have been stricken as false because Salavec never identified Frigenti, Jr. as one of his known accomplices. Third, in light of Frigenti, Jr.'s explicit decision not to cross-examine Salavec about their lack of prior association, we see no reason why the court should have granted a severance or declared a mistrial, and none are offered. Accordingly, because trial counsel "exercised sound professional discretion by declining to make . . . plainly frivolous . . . motion[s]," Frigenti, Jr.'s ineffective assistance claim must fail. *United States v. Caputo,* 808 F.2d 963, 967 (2d Cir.1987).

## C. "CONSCIOUS AVOIDANCE" INSTRUCTION

■ Frigenti, Jr. claims that the court's instruction to the jury on "conscious avoid-ance" was not warranted by the evidence.[1] Because he failed to object to the charge at the time of trial, we should reverse only if the court's decision to give the charge was "plain error." *See* Fed.R.Crim.P. 52(b); *see also United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (plain-error doctrine allows correction of "particularly egregious errors" that "seriously affect the fairness, integrity or public reputation of judicial proceedings"). We do not believe, however, that there was any error in including the charge.

■ The conscious avoidance is used "where a defendant has claimed lack of some specific aspect of knowledge necessary to conviction but where the evidence may be construed as deliberate ignorance." *United States v. Lanza,* 790 F.2d 1015, 1022 (2d Cir.) (collecting cases), *cert. denied,* 479 U.S. 861, 107 S.Ct. 211, 93 L.Ed.2d 141 (1986). The charge is warranted only where the evidence is such that a rational juror could be "persuaded beyond a reasonable doubt that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact." *United States v. Rodriguez,* 983 F.2d 455, 458 (2d Cir.1993).

Evidence showed that Frigenti, Jr. helped Boothe pick up the ten cartons of paper from Lindenmyre. After leaving Lindenmyre, Frigenti, Jr. stopped the van to replace the license plates with another set of plates which were also registered to a fictitious person. He then drove from Queens to Long Island in a manner apparently calculated to avoid being followed. After dropping off Boothe, he proceeded to the home which he shared with Frigenti, Sr., where the paper was unloaded and stored in the garage. Sev-

---

1. The court instructed:
   In determining whether a defendant acted knowingly, you may consider whether that defendant deliberately closed his eyes to what would otherwise have been obvious to him. If you find beyond a reasonable doubt that a defendant acted with a conscious purpose to avoid learning the truth, then this element may be satisfied. However, guilty knowledge may not be established by demonstrating that a defendant was merely negligent, foolish or mistaken.

   If you find the defendant Frank Frigenti, Jr. was aware of a high probability that the paper purchased was to be used in a counterfeit scheme and that he acted with deliberate disregard of the facts, you may find that he acted knowingly. However, if you find that Frank Frigenti, Jr. actually believed that the paper was purchased for a legitimate purpose, he may not be convicted.
   Trial Tr. at 638–39.

eral days later, Frigenti, Jr. accompanied the van carrying the paper onto the Long Island Expressway and drove in a manner evidently aimed at detecting surveillance. Taken together, these facts would allow a rational juror to conclude that Frigenti, Jr.: (1) knew the particular criminal purpose furthered by his actions; or (2) was aware of the probability that his actions served an illegal end, but purposely avoided learning the nature of the scheme in which he assisted. As the defense claimed he had no knowledge of the counterfeiting operation, the court properly instructed the jury on conscious avoidance.

## D. SUFFICIENCY OF THE EVIDENCE

■ Frigenti, Jr. argues that the evidence was insufficient to support his conviction for conspiracy. "A conviction must stand against such a challenge if, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences in its favor, 'any rational trier of fact could have· found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Gordils*, 982 F.2d 64, 70 (2d Cir.1992) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)), *cert. denied*, —— U.S. ——, 113 S.Ct. 1953, 123 L.Ed.2d 657 (U.S.1993).

While Frigenti, Jr. does not contest the existence of a conspiracy among Boothe, Frigenti, Sr., and Salavec, he argues that there was insufficient evidence for the jury to conclude that he was a member of it. We have noted that:

> [o]nce a conspiracy is shown to exist, the evidence sufficient to link another defendant to it need not be overwhelming. However, the evidence must show that the defendant, even if unaware of the contours of the broader conspiracy, at least had knowledge that a common unlawful endeavor existed, and that the defendant agreed to join that endeavor.

*United States v. Casamento*, 887 F.2d 1141, 1156–57 (2d Cir.1989) (citations omitted), *cert. denied*, 493 U.S. 1081, 110 S.Ct. 1138,

107 L.Ed.2d 1043, *and cert. denied*, 495 U.S. 933, 110 S.Ct. 2175, 109 L.Ed.2d 504, *and cert. denied*, 495 U.S. 958, 110 S.Ct. 2564, 109 L.Ed.2d 746 (1990). The evidence that Frigenti, Jr. picked up and transported the paper, changed the van's license plates, and drove in a suspicious manner, taken together, was sufficient to allow the jury to conclude he had knowledge of the unlawful nature of the undertaking and had agreed to join in it.

## E. FRIGENTI, JR.'S AND BOOTHE'S SENTENCES

Frigenti, Jr. and Boothe contend that the court erred in denying them two-level reductions for acceptance of responsibility. Frigenti, Jr. also argues that the court erred in giving him a 15–level enhancement for the amount of money involved in the counterfeiting operation. We disagree.

### 1. Acceptance of Responsibility

■ The Guidelines entitle a defendant to a two-level reduction of his offense level if he "clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct." U.S.S.G. § 3E1.1(a) (Nov.1990).[2] Whether or not a defendant has accepted responsibility is a factual matter as to which the district court's determination should not be disturbed "unless it is 'without foundation.'" *United States v. Irabor*, 894 F.2d 554, 557 (2d Cir. 1990) (quoting *United States v. Thomas*, 870 F.2d 174, 176 (5th Cir.1989)). Frigenti, Jr. and Boothe argue that the district court erred in denying them the reduction solely because their acceptance of responsibility came after conviction at trial. We disagree.

The record indicates that during his post-conviction interview with the Probation Office, Frigenti, Jr. admitted only that he drove the van and picked up the paper. He continued to deny that such actions constituted criminal conduct or that he had knowledge of the counterfeiting operation. Accordingly, Frigenti, Jr.'s contention that the court de-

---

**2.** References to the Guidelines are to the version in effect on April 29, 1992, the date defendants were sentenced. *See* 18 U.S.C. § 3553(a)(4) (1988). Since then, a new version of § 3E1.1,

with different language and commentary, took effect. *See* United States Sentencing Commission, *Guidelines Manual*, App. C, n. 459.

nied the reduction solely because he proceeded to trial finds no support in the record.

■ As this issue relates to Boothe, we also find that the court properly denied the reduction. In refusing to give Boothe the reduction, the court relied essentially on the reasons advanced by the government, which had argued, *inter alia,* that Boothe had failed to prove the sincerity of his acknowledgement of guilt and acceptance of responsibility. On this record, Boothe's contention that the court denied the reduction solely because he proceeded to trial cannot be sustained.

### 2. *Enhancement for the Amount of Money Involved*

■ Frigenti, Jr. also objects to the 15–level enhancement which the court imposed based on more than $10 million involved in the counterfeiting operation, arguing that: (1) the enhancement was excessive; and (2) the amount of money was not foreseeable to him. We disagree.

Frigenti, Jr.'s first contention overlooks the Guidelines' plain direction that in cases of conspiracy "[t]he base offense level from the guideline for the object offense, plus any adjustments from such guideline" applies. U.S.S.G. § 2X1.1(a). The guideline governing counterfeiting instructs the court to enhance by 15 levels where, as here, the offense involved more than $10 million. *See* U.S.S.G. § 2B5.1(b)(1) (referring to U.S.S.G. § 2F1.1(b)(1)(P)). We are not persuaded by Frigenti, Jr.'s argument that the Sentencing Commission acted irrationally or in excess of its power in directing the same enhancement to apply both to conspiracy and to the substantive offense of counterfeiting.

■ As for Frigenti, Jr.'s second contention, considering that he was personally involved in picking up and transporting ten cartons of paper and that the jury found him guilty of membership in the conspiracy, the court's determination that the amount of money involved in the offense was foreseeable to him was not clearly erroneous. *See United States v. Pitre,* 960 F.2d 1112, 1126 (2d Cir.1992). In any event, the court was required to calculate Frigenti, Jr.'s offense level based on "all acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable." U.S.S.G. § 1B1.3(a)(1). Thus, Frigenti, Jr.'s sentence was properly based on the more than $10 million regardless of his ability to foresee the amount of money produced by the counterfeiting operation. *See id.,* comment. (n. 1. illus. a).

### F. *FRIGENTI, SR.'S SENTENCE*

■ We reject Frigenti, Sr.'s contention that the district court erred in enhancing his offense level two levels for his role as an "organizer" of the offense. *See* U.S.S.G. § 3B1.1(c). Evidence showed that Frigenti, Sr.'s role in the counterfeiting operation consisted of: meeting with Salavec and helping to enlist his aid in printing the money; storing the paper in his garage from March 1 to March 8; obtaining the van used to transport the paper to Manhattan; helping to transport the paper to Raleigh's offices; and remaining at Raleigh's offices while the counterfeit currency was printed. This evidence was sufficient to support the court's decision to apply the enhancement. *See* U.S.S.G. § 3B1.1, comment. (n. 3).

We have considered the defendants' other arguments and find them without merit.

Affirmed.