**UNITED STATES of America**

v.

**Jaime GAMEZ and Galo Polo, Defendants.**

**No. 97CR67 (JBW).**

United States District Court, E.D. New York.

April 6, 1998.

---

178

Zachary W. Carter, U.S. Attorney, Brooklyn, NY by Demetri Jones, Assistant U.S. Attorney, for U.S.

Garber, Klein & Nelson, Lake Success, NY by Alan M. Nelson, for Defendant Gamez.

Stein & Zadek, Woodhaven, NY by Peter S. Zadek, for Defendant Polo.

### MEMORANDUM, JUDGMENT, AND ORDER

WEINSTEIN, Senior District Judge.

I. *Introduction:*

Defendants Jaime Gamez and Galo Polo were convicted of conspiring to engage in money laundering in violation of 18 U.S.C. § 1956. They assisted Colombian narcotics traffickers using drug money to purchase automobiles in the United States for export to Colombia. Presented is the question—apparently of first impression—of whether conscious avoidance of knowledge that the money came from drugs suffices to enhance a sentence for knowledge of drug relatedness under the Guidelines.

For the reasons indicated below, conscious avoidance can substitute for knowledge equivalents under the Guidelines. Nevertheless, the government has failed to present sufficient evidence to warrant enhancement. Downward departure is appropriate.

II. *Facts:*

Defendants Gamez and Polo, in addition to their regular employment as car salesmen, operated an automobile brokerage company in Queens between June 1992 and June 1996. Their intended market was South Americans who sought to buy automobiles in the United States and ship them to Colombia in contravention of that country's tax and monetary laws.

Sixty-two deposits of funds were made to the company's bank account, totaling hundreds of thousands of dollars, almost exclusively in cash. The deposits were structured in this manner to avoid bank reporting requirements for cash deposits in excess of $10,000. *See* 31 U.S.C. § 5324; 31 C.F.R. § 103.22.

With the monies, defendants purchased more than a score of cars from a number of dealerships in New York, New Jersey, and Connecticut. The purchases were made ei-

ther in cash or with a combination of cash and checks from the company's account. Every vehicle was purchased at a cost of more than $10,000.

To facilitate these purchases, defendants were provided with identification documentation such as driver's licenses or social security numbers from their clients. Although it does not appear that defendants were aware of it, most of the identification was fictitious. At least one of their clients, "Fat Man," was a notorious drug trafficker, though neither defendant had specific knowledge of this fact or knew the client by that nickname.

Defendants voluntarily surrendered in January, 1997. In May 1997, they pleaded guilty. They must now be sentenced.

III. *Guidelines Computation:*

Under the Guidelines, the base offense level for these defendants is 20. U.S.S.G. § 2S1.1(a)(2). Three points are added for the amount of money involved, U.S.S.G. § 2S1.1(b)(2)(D). Three points are deducted for acceptance of responsibility. U.S.S.G. § 3E1.1(a), (b)(2). With an adjusted offense level of 20, defendants face 33 to 41 months' imprisonment.

IV. *Request for Enhancement:*

The government urges that an additional three point enhancement be imposed pursuant to section 2S1.1(b)(1) because these are drug-related offenses. The Guideline reads:

> If the defendant knew or believed that the funds were the proceeds of an unlawful activity involving the manufacture, importation, or distribution of narcotics or other controlled substances, increase [the base offense level] by 3 levels.

The defendants, the government asserts, knew or believed that the cash they received was derived from drug trafficking activities. While it acknowledges no direct evidence of actual knowledge of the genesis of the funds, circumstantial and other proof, it contends, establishes that the defendants knew they were dealing with drug money. The government further claims that even if the defendants did not have actual knowledge, they

consciously avoided the truth, with the same effect as full awareness.

Defendants concede that they knew the funds they received had an illegal source, but they contend they did not know of any drug relationship. In fact, evidence in many of the cases in this court suggests that a good deal of the cash spent by foreign and domestic criminals in New York is generated by illegal activities other than narcotics trafficking. *Cf.* President's Commission on Organized Crime, *The Cash Connection: Organized Crime, Financial Institutions, and Money Laundering* 7–8 (1984) (criminal organizations other than those engaged in drug trafficking use money laundering schemes to funnel money). Thus, defendants' position can not be rejected out of hand.

### A. *Law:*

#### 1. *Mens Rea Generally:*

■ Evaluation of *mens rea* is critical in sentencing. Guilty state of mind is "a moral prerequisite to the imposition of punishment." Susan L. Pilcher, *Ignorance, Discretion and the Fairness of Notice: Confronting "Apparent Innocence" in the Criminal Law*, 35 Am.Crim.L.Rev. 1, 1 (1995); *see also United States v. Cordoba–Hincapie*, 825 F.Supp. 485, 521 (E.D.N.Y.1993) ("operation of the *mens rea* principle takes on a special character at sentencing"); Fred A. Bernstein, *et al.*, *The Denigration of Mens Rea in Drug Sentencing*, 7 Fed.Sent.Rep. 121, 121 (1994) ("*Mens rea*, a principle central to our criminal law, is crucial in linking punishment to individual culpability."). Moreover it is critical in predicting future dangerousness of the defendant.

#### 2. *Conscious Avoidance Generally:*

Yet, divining what a person knew presents great difficulty. *See Rumely v. United States*, 293 F. 532, 560 (2d Cir.), *cert. denied*, 263 U.S. 713, 44 S.Ct. 38, 68 L.Ed. 520 (1923) ("Knowledge, being a mental condition, undisclosed, cannot always be proven by direct or express testimony."); Robin Charlow, *Wilful Ignorance and Criminal Culpability*, 70 Tex.L.Rev. 1351, 1359–60 (1992) ("There is rarely direct evidence of knowledge, such as an admission by a defendant.").

■ Substituting conscious avoidance of the truth as a proxy for knowledge is one way in which the law has dealt with the problem of proof. *See* Jonathan L. Marcus, Note, *Model Penal Code Section 2.02(7) and Willful Blindness*, 102 Yale L.J. 2231, 2233–34 (1993) (origins of willful blindness rules in English Common Law). The Supreme Court first addressed the concept almost a century ago in *Spurr v. United States*, 174 U.S. 728, 735, 19 S.Ct. 812, 43 L.Ed. 1150 (1899), explaining that "evil design may be presumed if the [defendant] purposely keeps himself in ignorance . . . ." Since then, other cases have developed and refined the general rules relating to conscious avoidance, sometimes referred to as willful blindness or deliberate ignorance of fact.

■ The recommendations of the Model Penal Code based on probability of awareness have played a large role in this evolution. *See, e.g., Leary v. United States*, 395 U.S. 6, 46 n. 93, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969) (applying the Model Penal Code's definition of knowledge which provides "knowledge [of a fact] is established if a person is aware of a high probability of its existence"); *Turner v. United States*, 396 U.S. 398, 416, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970) (specific knowledge of a particular fact can be inferred from defendant's awareness of high probability that it is so); *see also United States v. Squires*, 440 F.2d 859, 864 (2d Cir. 1971) ("whenever . . . ignorance of fact is claimed, it is recognized that one may not deliberately close his eyes to what otherwise would have been obvious to him"); Jonathan L. Marcus, Note, *Model Penal Code Section 2.02(7) and Willful Blindness*, 102 Yale L.J. 2231, 2232 (1993) (federal courts' use of Model Penal Code's test for willful blindness determination). Distillation of this authority results in the maxim: "deliberate ignorance and positive knowledge are equally culpable." *United States v. Jewell*, 532 F.2d 697, 700 (9th Cir.), *cert. denied*, 426 U.S. 951, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976).

■ For purposes of finding criminal liability it is common to charge juries in

criminal trials that under certain circumstances knowledge can be inferred when a defendant intentionally remains ignorant of pertinent facts. *See, e.g., United States v. Boothe,* 994 F.2d 63, 69–70 (2d Cir.1993); *United States v. Shareef,* 714 F.2d 232, 233–34 (2d Cir.1983); *see also* Leonard B. Sand, *et al., Modern Federal Jury Instructions* 3A–4 (1997) (instruction 3A–2, "Conscious Avoidance: Deliberately Closing Eyes"). As the court of appeals explained in *United States v. Lanza:*

> The conscious avoidance charge commonly has been used where a defendant has claimed lack of some specific aspect of knowledge necessary to conviction but where the evidence may be construed as deliberate ignorance.

*Lanza,* 790 F.2d 1015, 1022 (2d Cir.), *cert. denied,* 479 U.S. 861, 107 S.Ct. 211, 93 L.Ed.2d 141 (1986). At trial, the burden of proving conscious avoidance beyond a reasonable doubt is on the prosecution; jurors must be told that mere negligence, foolishness, or naivete on the part of a defendant does not suffice. *See United States v. Boothe,* 994 F.2d 63, 69 (2d Cir.1993).

Money laundering prosecutions often present this issue. Those "washing" money frequently have not engaged directly in the criminal action that dirtied the cash. *See* Joel Androphy, *White Collar Crime* § 22.02 at 720–21 (1992) (discussion of conscious avoidance in relation to money laundering cases). Thus, when money laundering statutes are "used against third parties who are not responsible for the underlying illegal activity, proving knowledge of the funds' illegal source becomes more difficult." Rachel Ratliff, *Third–Party Money Laundering; Problems of Proof and Prosecutorial Discretion,* 7 Stan.L. Pol'y Rev. 173, 174–76 (1996); *cf.* President's Commission on Organized Crime, *The Cash Connection: Organized Crime, Financial Institutions, and Money Laundering* 10–11 ("magnitude of the money laundering problem is . . . evidenced by the variety of the schemes and the diversity of the participants . . .") (1984).

3. *Conscious Avoidance Under Guidelines:*

■ The court has not found, nor have the parties cited, any cases that specifically address the narrow issue now presented—whether conscious avoidance rules may be applied under the enhancement provisions of section 2S1.1 of the Guidelines, requiring knowledge of drug relatedness. Closely related, however, is *Aguilar v. United States,* 1997 WL 833449, at *2 (E.D.N.Y. Dec.19, 1997). There the "conscious avoidance" principle was applied to section 2S1.3 of the Guidelines in finding that a defendant knew that funds were proceeds of some unlawful act because "huge amounts of cash being structured in a relatively brief period of time so plainly reflected criminal activity." *Id.*

In a closely related issue, that of willfulness rather than knowledge, *United States v. Reed,* 88 F.3d 174, 178 (2d Cir.1996), approved enhancement. *Reed* was a case dealing with obstruction of justice under section 3C1.1 of the Guidelines based upon a defendant's willful failure to appear for sentencing. *Id.* at 177–78. The court of appeals explained that "[t]he finding that [defendant] consciously avoided timely knowledge of his new sentencing date is a permissible inference from [defendant's] testimony that his attorney was to let him know in advance of the sentencing date, and the undisputed facts that when [defendant] moved from his . . . residence" he did not inform his attorney or any agent of the government. *Id.* at 180.

Conscious avoidance and deliberate ignorance rules should be applicable to enhancement determinations under section 2S1.1 of the Sentencing Guidelines for a number of reasons. First, such a rule comports with the procedures employed for determining knowledge in substantive offenses. No rationale for applying one standard of guilt during trial but a different one at sentencing has been suggested.

■ Second, it is well understood that courts can use almost any source of information for fact-finding at sentencing. *See* U.S.S.G. § 6A1.3 ("[i]n resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence.");

*cf. United States v. Shonubi,* 962 F.Supp. 370, 374 (E.D.N.Y.1997) (requiring special restrictive category of evidence for sentencing purposes is inappropriate).

Third, given the dangers of money laundering and the opportunities that it creates for drug dealers to engage in profitable drug trafficking, it is sensible to impose a heavier penalty when the government has clearly shown that the launderer had every reason to know he was dealing with a narcotics trafficker but chose to deliberately ignore the effect of his or her activities. The courts of this circuit should not ignore what is clear from its cases: drug trafficking on the scale it is conducted in the Metropolitan New York area generates hundreds of millions of dollars in cash which must be laundered and syphoned back to the Drug Lords in other countries. *See, e.g.,* Dean Foust, *The New, Improved Money Launderers,* Bus. Wk., June 28, 1993, at 90 (recounting that criminals launder approximately $300 billion a year through United States financial systems, including New York's).

### 4. *Burden of Proof:*

■ The court of appeals for the Second Circuit requires a somewhat heavier standard than a preponderance of the evidence at sentencing when the issue in dispute could substantially enhance the Guidelines penalty. *See, e.g., United States v. Shonubi,* 103 F.3d 1085, 1089 (2d Cir.1997) ("a more rigorous standard [than that of a preponderance of the evidence] should be used in determining disputed aspects of relevant conduct where such conduct, if proven, will significantly enhance a sentence"); *United States v. Gigante,* 94 F.3d 53, 56 (2d Cir.1996), *cert. denied,* — U.S. ——, 118 S.Ct. 179, 139 L.Ed.2d 119 (1997) ("the Court may examine whether the conduct underlying multiple upward adjustments was proven by a standard greater than that of preponderance").

### B. *Application of Law to Facts:*

■ In this case, the evidence does not support enhancement. It is well known to law enforcement personnel that Colombia is a source country for cocaine and that defendants were sending cars to Colombia for clients who possessed large sums of cash. Courts as objective arbiters, however, must be careful not to impute specific knowledge based solely upon negative stereotypes and generalizations about particular groups. *See* Rachel Ratliff, *Third–Party Money Laundering: Problems of Proof and Prosecutorial Discretion,* 7 Stan. L. & Pol'y Rev. 173, 177 (1996) ("strict enforcement of the [Money Laundering Control Act] could make it more difficult for some minorities to purchase consumer goods"). The evidence strongly suggests that a great deal of consumer goods are bought for cash by persons from South America who do not deal in drugs. Criminals and non-criminals may do this to avoid their country's currency regulations and taxes. *Cf.* Mike France, *Corporate America's Colombian Connection,* Bus.Wk., Dec. 1, 1997, at 165 (money laundering schemes used, in part, by some Colombian business people to avoid import taxes of 23% to 41%); Juanita Darling, *Colombia's Contraband Culture, Drug Money Meet at San Andresitos Latin America: At Shady Discount Malls, Smugglers Can Convert Dollars and Consumers Don't Pay Retail,* Los Angeles Times, Sept. 7, 1997, at A17 (discussing high import taxes and tariffs of Colombia which can increase the price of an item by approximately 25%); Thomas T. Vogel, Jr., *Contraband is Big Business in Colombia,* Wall St.J., Dec. 17, 1996, at A18 (Colombians seeking other means to purchase consumer goods due to high tariffs on imports purchase smuggled goods).

That defendants knew they were dealing in illegally obtained cash was clear. That they knew—or closed their eyes to the fact—the monies were drug proceeds is not.

### V. *Request for Downward Departure:*

The defendants have moved for a downward departure on a number of grounds. Their motion must be granted. This case is outside of the "heartland" of money laundering prosecutions. The aberrational nature of defendants' conduct, their difficult family circumstances, as well as their demonstrated rehabilitation, support a further downward departure.

A. *Outside Heartland of Money Laundering Crimes:*

 The money laundering crime in this case differs from the sort of mainstream money laundering scheme contemplated by the Sentencing Commission. *Koon v. United States,* 518 U.S. 81, 116 S.Ct. 2035, 2049–50, 135 L.Ed.2d 392 (1996)(approving downward departure where criminal conduct is outside of the "heartland" of cases covered by the guideline). Defendants were operating a lawful business in an apparently lawful way with some legitimate clients.

They charged fees for their work that were the same as those for fully legal sales of cars. No highly organized enterprise or expansive system reaping large profits for the actors was involved. The defendants shopped to get the lowest possible price for their clients. They did not seek a premium in profits because of the illegal connection. From the entire scheme involving hard work over a number of months, defendants each received only about $5,250 in fees.

As in *United States v. Caba,* 911 F.Supp. 630–38 (E.D.N.Y.), *aff'd,* 104 F.3d 354, 1996 WL 685764 (1996):

> ... [Defendants'] conduct, although falling within the literal definition of money laundering, does not embrace the "heartland" of such an offense. It would be completely contrary to the general purposes of the sentencing guidelines to exponentially increase the seriousness of the [defendants'] criminal conduct by employing the money laundering guideline as the basis for establishing an appropriate and fair sentence.

Because of the limited proceeds and the relatively small scale of defendants' operation, departure is permitted on this ground. *United States v. Skinner,* 946 F.2d 176, 179 (2d Cir.1991) ("small amount of proceeds involved in the [money laundering] transaction" gave the district court authority to grant downward departure); *see also United States v. Johnson,* 964 F.2d 124, 130 (2d Cir.1992) (government conceded propriety of court's decision to treat bribery charge like an ordinary theft under the guidelines).

Defendants' conduct more closely resembles that under Guidelines section 2S1.3 relating to structuring transactions than that relating to laundering of drug money. Section 5324(a)(3) of Title 31 of the United States Code makes it illegal to structure or assist in structuring any transaction with a domestic financial institution with the purpose of evading the reporting requirements under the law, which require disclosure of transactions involving greater than $10,000. *See also* 31 U.S.C. § 5313; 31 C.F.R. § 103.22. Since the conduct of defendants is closer in many ways to the conduct prohibited by this statute than that proscribed by section 1956 of Title 18, using the provisions of 2S1.3 as a guidepost for departure is appropriate. *Cf.* U.S.S.G. Ch. 1, Pt. A(4)(a) ("a sentencing court may control any inappropriate manipulation of the indictment through use of its departure power").

Had defendants been charged under section 5324 of Title 31, the applicable base offense level of six under 2S1.3 would have been enhanced by ten points because the amount of funds involved was between $350,000 and $600,000, U.S.S.G. § 2F1.1(K), and by two points because defendants knew that the monies received came from an illegal source. U.S.S.G. § 2S1.3(b)(1). Once adjusted for acceptance of responsibility, U.S.S.G. § 3E1.1, the total offense level would have been 15, exposing defendants to 18 to 24 months' incarceration rather than to the 33 to 41 months they faced under a strict section 2S1.1 computation. The lower range is a fairer assessment of the level and severity of the crime in this case.

B. *Individual Circumstances of Defendants:*

 The individual backgrounds, circumstances, and needs of these particular defendants also must be taken into account in determining the correct penalty. *See United States v. Monk,* 15 F.3d 25, 29 (2d Cir.1994) ("when there are compelling considerations that take the case out of the heartland factors upon which the Guidelines rest, a departure should be considered").

1. *Aberrational Conduct:*

 Aberrational conduct generally involves activity that is spontaneous or

thoughtless. *United States v. Ritchey*, 949 F.2d 61, 63 (2d Cir.1991). A court must look to the totality of the circumstances surrounding criminal action to discern whether it justifies a departure based upon its aberrational nature. *United States v. Takai*, 941 F.2d 738, 743 (9th Cir.1991). Crimes that span a period of time, while not a "single act," under some circumstances may be considered so far out-of-the-ordinary for a defendant as to be aberrational. *United States v. Delvalle*, 967 F.Supp. 781, 783–84 (E.D.N.Y.1997).

■ The conduct in this case differs greatly from defendants' previous day-to-day activities. Neither has any prior criminal history. Both emigrated to the United States as young men, Polo from Ecuador, Gamez from Colombia, to overcome economic hardship and to find a better life. From there they developed productive, law-abiding lives, becoming naturalized citizens and upstanding members of the community. This latter conclusion is confirmed by the many letters received by the court from the defendants' family and friends.

Defendant Gamez has worked nearly his entire adult life. His first job in this country was that of a shipping clerk at a medical supply company where he earned $1.25 an hour. Over time, he improved his lot, working for a number of years in the aircraft design industry. In 1987, he moved to the automobile industry as a retail salesman, where he remains.

Defendant Polo also presents a stellar work history. His first employment in the United States was with a piano manufacturing company. From there, defendant Polo entered the armed services, where he served for a period of two years until his honorable discharge in 1970. Thereafter, he worked for ten years at a surgical supply company until 1980, when he began employment in the retail automobile sale business.

Given these histories, it is clear that the actions taken in connection with the instant crime are far different from those ordinarily taken by the defendants. Because the scheme does not typify the usual behavior of the defendants, departure on this ground is appropriate.

2. *Difficult Family Circumstances:*

■ Defendants' difficult family circumstances also support a lenient sentence. *See United States v. Johnson*, 964 F.2d 124, 129 (2d Cir.1992) (extraordinary parental responsibilities support downward departure); *United States v. Alba*, 933 F.2d 1117, 1122 (2d Cir.1991) ("close-knit family whose stability depends on [defendant's] continued presence" permits reduction in sentence).

Defendant Gamez, fifty-two years of age, has been married and living with his wife for some twenty-nine years. He is the father of three children. His wife, like him, is not a native of this country. Two of his children still live at home. One, a teenage boy, attends college with defendant's financial assistance. Economically, the Gamez family is almost exclusively supported by defendant Gamez's income.

This is particularly true since defendant's wife recently lost her job. Weeping in court, she detailed that her life would be almost impossible without her husband's help. If Gamez is removed from the home for a lengthy period of time, the family will be unable to make mortgage payments. And, without a father figure in the household, it is probable that defendant's spouse would have difficulty controlling and maintaining not only the home finances, but her teenage son.

Married and living together for approximately thirty years, defendant Polo and his wife have two children, one of whom still lives in the family home. That daughter clung to defendant at sentencing, barely able to communicate to the court between her sobs. Defendant's wife also had difficulty speaking to the court because, as a native of Ecuador, English is not her native language. She works only two days a month as a banquet hostess. The financial burdens of the family rest almost exclusively on defendant Polo.

Documentation was also submitted to the court relating to defendant Polo's wife's medical condition. She suffers from a narrowing of the intervertebral neural canal, asthma, hypothyroidism, severe diabetes, and a nervous condition. Her back condition requires regular rehabilitative therapy. For her dia-

betes she must take insulin injections every day, with which she has great difficulty due to poor vision. Defendant must assist in medicating his wife.

Seldom do defendants present the sort of unique bond with their kin that was apparent in this case. Because of the detriment that would be felt by the families of the defendants if lengthy periods of incarceration were imposed, there is discretion to depart downward based upon family circumstances. *See United States v. Galante,* 111 F.3d 1029, 1033 (2d Cir.1997) ("when a sentencing court determines that the circumstances related to family ties and relationships are extraordinary, the Guidelines do not bar it from considering them as a basis for downward departure"); *see also* Dana L. Shoenberg, *Departures for Family Ties and Responsibilities After Koon,* 9 Fed.Sent.Rep. 292, 295 (May/June 1997) ("Because sentences may have drastic collateral consequences for innocent third parties, courts should not be discouraged from departing for family reasons."); Essay, *The Effect of Sentencing on Women, Men, the Family, and the Community,* 5 Colum.J.Gender & L. 169, 175–180 (1996) (familial responsibilities should play a role at sentencing).

### 3. *Rehabilitation:*

 Rehabilitation before sentence is a ground for departure. *See United States v. Core,* 125 F.3d 74, 79 (2d Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 735, —— L.Ed.2d —— (1998) (steps towards rehabilitation proper consideration for departure); *see also United States v. Flowers,* 983 F.Supp. 159, 166 (E.D.N.Y.1997) (discussion of pre-sentence rehabilitation as a factor to be considered in granting downward departure). Coming under the watchful eye of the criminal justice system has turned defendants away from the path of illegality, likely forever. Both defendants have changed for the better. Specific deterrence has been achieved.

### VI. *Determination of Appropriate Offense Level and Sentence:*

#### A. *Gamez:*

 For defendant Gamez, a downward departure of no less than eight levels, from offense level twenty to offense level twelve is necessary. A reduction from twenty to fifteen reflects use of the Sentencing Guidelines' provisions relating to structuring offenses. The remainder of the departure— from offense level fifteen to offense level twelve—reflects a determination that defendant's rehabilitation, family circumstances, and aberrational conduct warrant a term of incarceration at least three levels lower than that provided by the Guidelines range at level fifteen.

Offense level twelve, at "Zone C" of the Guidelines' Sentencing Table, has a sentencing range of ten to sixteen months. A defendant, falling within "Zone C," however, may be sentenced to a "split sentence" under the Guidelines. In a such a sentence:

> the court must impose at least one-half the minimum confinement sentence in the form of prison confinement, the remainder to be served on supervised release with a condition of community confinement or home detention.

U.S.S.G. Ch. 1, Pt. A(4)(d) (probation and split sentences) and § 5C1.1(d).

Defendant Gamez is, therefore, sentenced to five months' incarceration followed by five months of home confinement. At the end of his split sentence, it is ordered that defendant serve an additional three years of supervised release. U.S.S.G §§ 5D1.1, 5D1.2. A fine of $10,000 is also imposed, U.S.S.G. § 5E1.2(c), along with a special assessment of $50. U.S.S.G. § 5E1.3. The fine may be paid up to the end of the supervised release period without interest.

#### B. *Polo:*

 The same analysis regarding the use of the structuring Guideline applies to defendant Polo. A greater reduction in sentence is warranted for this defendant based upon additional mitigating evidence. Defendant Polo's prior military service as well as his wife's serious medical condition, which necessitates his taking on a caregiver role, re-

quires an offense level for this defendant of ten.

When a defendant's total offense level is ten, at "Zone B" of the Sentencing Table:

the court may substitute probation for a prison term, but the probation must included confinement conditions (community confinement, intermittent confinement, or home detention).

U.S.S.G. Ch. 1, Pt. A(4)(d) (probation and split sentences) and § 5C1.1(c).

Accordingly, defendant Polo is sentenced to probation for three years and ten months; as a condition there shall be five months of community confinement to be followed by five months of home detention. U.S.S.G. §§ 5B1.1(a)(2), 5B1.2(a)(1); *cf. United States v. Adler*, 52 F.3d 20, 21–22 (2d Cir. 1995) (unusual family circumstances and history of community service supported departure to a sentence of six months' community confinement and six months' supervised release). He is to be permitted to leave community and home confinement to attend work and administer his wife's medication. A $10,000 fine and a $50 special assessment are also imposed. U.S.S.G. §§ 5E1.2(c)(3), 5E1.3. The fine may be paid up to the end of the period of probation without interest.

VII. *Conclusion:*

While the penalty in this case is less than that called for by the Guidelines, it should send a sufficiently strong message to car dealers and other entrepreneurs that using a lawful enterprise to assist criminals in money washing is dangerous and bad business.

So Ordered.