UNITED STATES of America,

v.

Antony Alexander BLAREK II
and Frank V. Pellecchia,
Defendants.

No. 97 CR 544(JBW).

United States District Court,
E.D. New York.

May 21, 1998.

Zachary W. Carter, U.S. Attorney, Brooklyn, NY by Mark W. Lerner, Assistant U.S. Attorney, Richard Weber, Assistant U.S. Attorney, for United States.

Jason L. Solotaroff, New York City, for defendant Blarek.

Stillman & Friedman, P.C., New York City by Paul Shechtman, Lauren Goldberg, for defendant Pellecchia.

## MEMORANDUM, JUDGMENT AND ORDER

WEINSTEIN, Senior District Judge.

I. **Introduction** ............................................... 195

II. **Facts** ...................................................... 195
 A. Charges ................................................. 195
 B. Evidence ................................................ 196
 C. Verdict ................................................. 197
 D. Forfeiture Stipulation ................................... 197
 E. Presentence Report Computations ........................ 197
 F. Sentencing Motions ...................................... 198

III. **Law** ....................................................... 198
 A. Sentencing Statute: 18 U.S.C. § 3553 ................... 198

1. Sufficient But Not Greater Than Necessary ...........................198
2. Seriousness of the Offense, Adequate Deterrence, Protection of the
 Public, and Correctional Treatment .................................198
 B. Traditional Sentencing Rationales .................................199
 1. Kant's Retributive Just Desert Theory ...........................200
 2. Bentham's Utilitarian Theory ...................................201
 3. Sanctions in Strict Retributive and Utilitarian Models .........202
 C. Utility and Retribution Under Sentencing Guidelines .............203
 D. Deference to Sentencing Judge on Guidelines' Critical Sentencing Issues.....204
 E. Application of the Guidelines....................................206
 1. Heartland .....................................................206
 2. Departures ....................................................207

IV. Law Applied to Facts .............................................207
 A. Guidelines Computations .......................................207
 1. Base Offense Level ...........................................207
 2. Knowledge of Drug Trafficking Source .........................208
 3. Amount of Funds ..............................................208
 4. Supervisory Role .............................................208
 5. Obstruction of Justice .......................................209
 6. Total Computations ...........................................209
 B. Traditional and Statutory Sentencing Rationales ...............209
 1. Incapacitation ...............................................209
 2. Rehabilitation ...............................................209
 3. Deterrence ...................................................210
 4. Retribution ..................................................210
 5. Sufficient But Not Greater Than Necessary ....................210
 C. Departures ....................................................210
 1. Not a Heartland Case .........................................211
 2. Vulnerability of Blarek and Pellecchia .......................211
 3. Pellecchia's Medical Condition ...............................212
 4. Duress, Family Circumstances, and Reduced Culpability ........213
 D. Other Considerations ..........................................213
 E. Individual Sentences ..........................................213
 1. Blarek .......................................................213
 2. Pellecchia...................................................213

V. Conclusion .......................................................214

## I. Introduction

This sentencing presents the unusual case of two talented decorators whose desires to rise in the ranks of their profession while having access to unlimited funding for their creative endeavors induced them to become the facilitators, through money washing, of a ruthless and notorious Colombian drug cartel's operations.

A long term of incarceration and severe monetary penalties that will strip defendants of all their assets is required. The sentences are designed to penalize the defendants for their criminal behavior and to deter other business and professional people from assisting drug traffickers.

## II. Facts

### A. Charges

Defendants Blarek and Pellecchia were arrested in March 1996. They were charged with Racketeering, 18 U.S.C. § 1962(c), Racketeering Conspiracy, 18 U.S.C. § 1962(d), and Conspiring to Launder Monetary Instruments, 18 U.S.C. §§ 371 and 1956(h), for their alleged involvement in the activities of the Santacruz faction of the Cali Colombia drug mob. Blarek was additionally charged with one count of Interstate Travel in Aid of Racketeering. 18 U.S.C. § 1952(a)(1). By way of indictment, the government sought the forfeiture of defendants' property traceable to their alleged criminality. Both defendants pleaded not guilty.

## B. *Evidence*

Blarek, while operating his own interior design firm in Coconut Grove, Florida, met Pellecchia in 1980. They worked together, and became intimate, cohabitating as homosexual partners.

Quickly they established a new decorating company. Blarek was President and Pellecchia Vice–President. The venture was successful. Defendants designed, remodeled, and renovated homes and offices for a broad range of private persons and businesses.

Beginning in the early 1980's, the nature of defendants' operation changed. From that time forward they worked almost exclusively for a single, ill-famed and powerful criminal client—Jose Santacruz Londono.

Blarek met Santacruz by chance in 1979 during a visit to friends in Colombia. He agreed to work for Santacruz, designing the interior of the drug lord's new ostentatious home. Blarek was paid a handsome sum for this work. So extraordinary was the dwelling, its furnishings, and its equipment that its photograph appeared on the cover of a major American interior design magazine.

Other dealings with Santacruz followed. Over a twelve year period, the defendants designed and decorated a number of offices and living spaces for Santacruz, his wife, his mistresses, and his children. Defendants provided everything from blueprints and construction designs to lighting, appliances for huge kitchens, carpeting, draperies, furniture, artwork, and even specially produced crockery and flatware.

The projects presented no simple decorating task. Some homes contain their own beauty salons, others have ornate marble and granite work with stone that was selected by the defendants in Italy. Defendants were responsible for obtaining unblemished cattle for leather, as well as the very best equipment and electrical materials from the United States and abroad for Santacruz and the various apartments of his wife and mistresses. Some residences were refurbished with elaborate secret compartments. Expense was of almost no significance as an inhibitor to artistic imagination.

Defendants were extraordinarily proud of their designs. At the trial every facet of their work was described by them in great detail with the aid of video cassettes, photographs, and samples.

It was clear that designing was more than a livelihood for these defendants. It was their passion. Yet, they were apparently unaware of the irony of their trial situation. While listening to a defendant's descriptions of the embellished bedrooms and recreation areas created for the children of Jose Santacruz, and how much fun they would provide for these young people, the jury could not help but reflect on the thousands of teens whose lives had been ruined by Cali cartel drugs sold for the cash used to pay for Santacruz's extravagant lifestyle.

There is little doubt that defendants delivered exceptional design services to Santacruz. They also knowingly provided something even more valuable to him—a method for laundering his drug cash in the United States and converting it to assets movable to Colombia. Defendants laundered, spent, and were compensated with millions of dollars, the proceeds of the cartel's profitable drug trade in the United States.

Defendants knowingly laundered tainted cash for Santacruz in the United States in order to continue exercising their own craft and to enhance their own lives. They could not help but be aware of the illegal drug-related activities of their client. Both Blarek and Pellecchia knew who Jose Santacruz was, what he did, and from where his money was derived. Yet, each voluntarily agreed to, and in fact did, "wash" his drug proceeds. They converted huge amounts of currency that was delivered to them secretly in boxes, paper sacks, duffel bags, and an expensive designer sachel into assets the drug cartel could remove from this country.

Elaborate and elusive bookkeeping methods were developed in order to keep track of the funds received from Santacruz, while at the same time protecting his identity. Defendants' secretary, a key government witness at the trial, was told not to record Santacruz's name on any company documents or bookkeeping ledgers, and not to

disclose when the defendants traveled to meet with him or his agents in Colombia.

Feigned trips to countries like Spain hid the fact that defendants were in Colombia meeting with a drug lord. Defendants lied about the identity of their client to others, informing a number of suppliers that they worked for Spanish royalty or prominent individuals in other countries. Defendant Blarek even bleached out entries in his passport to hide the extent of his travel to Colombia.

Nearly all transactions between Santacruz and defendants were in cash. Defendants traveled to Miami, New York City, and other pre-determined locations to receive large sums of money from Santacruz's couriers. Payments as high as one million dollars at a time were hand-delivered to defendants in piles of fifty and one-hundred dollar bills. Defendants moved the cash between cities, traveling by car or train to avoid airport searches.

Portions of the funds were deposited in defendants' safe deposit boxes, or in bank accounts in amounts of less than $10,000 at a time to avoid federal bank transaction reporting requirements. *See* 31 C.F.R. § 103.22; *see also* 31 U.S.C. § 5324. In addition, defendants' own accountant, who pleaded guilty to money laundering and testified as a government witness, converted some one million dollars of the drug cash into checks for the defendants, thus "cleaning" the money for routine use in defendants' business operations.

Over the years, defendants were visited on a number of occasions by members of the United States Drug Enforcement Agency. They informed defendants that Santacruz was a drug trafficker and inquired if the defendants knew where he could be found. On at least one occasion, in 1987, Blarek lied to the agents, telling them that he had not seen Santacruz since 1980 even though he and his co-defendant in fact had, and continued to have, extensive contact with Santacruz until his death in March, 1996.

Taped telephone conversations between defendant Blarek and a government witness unequivocally proved that both defendants were aware of the nature of Santacruz's business, and that, if caught, they would attempt to conceal the fact that they were engaged in illegal activity for the drug trafficking organization.

Despite their covert actions and plans, defendants flaunted their own illegal income. On Santacruz's drug money, defendants lived lavish lives. Their home, "Villa Vecchia," in an exclusive area in San Francisco, California, reflects an affluent lifestyle. Their vehicles included a Mercedes–Benz automobile and Harley Davidson motorcycles. Their clothing was impeccable and of the highest quality. For their fine work, they were well paid by their drug lord client, and they did not stint in enjoying their profits.

### C. *Verdict*

After a two week trial, in February, 1997, defendants were each found guilty of the Racketeering Conspiracy and Money Laundering Conspiracy counts. The jury also returned a verdict of Blarek's guilt of Interstate Travel in Aid of Racketeering.

### D. *Forfeiture Stipulation*

Following trial, defendants entered into a stipulation with the government, forfeiting nearly all of their property, including their home in San Francisco worth over two millions dollars, three Harley Davidson motorcycles, a Mercedes Benz automobile, approximately $75,000 worth of jewelry, and hundreds of thousands of dollars in bank accounts and safe deposit boxes.

### E. *Presentence Report Computations*

According to the Presentence Reports prepared by the United States Probation Office, defendants' offense conduct after 1986 involved at least $5.5 million dollars. In the process of "grouping" the counts, Guideline level 20 was used as an appropriate base offense level reflecting a determination that violation of section 1956(a)(1)(b)(i) of Title 18 of the United States Code was one of the underlying objectives of the conspiracies. *See* U.S.S.C. § 2S1.1(a)(2). Additionally, enhancements were made to the initial offense levels based upon defendants' knowledge that the monies received were drug proceeds and for their supervisory role in the crimes.

Further upward adjustment to Blarek's offense level was predicated upon obstruction of justice for his alleged false testimony at the trial.

Taking these factors into account, the Presentence Report indicates Blarek has a combined adjusted offense level of 33 based upon the three counts for which he was convicted. His criminal history category is I, since he has no prior record. His Guidelines imprisonment range would then be 135 to 168 months. A fine range for Blarek's crimes of $20,000 to $14,473,063, as well as a required period of supervised release of at least two but not more than three years is also indicated.

Pellecchia's combined adjusted offense level, according to the Presentence Report, is 33. He, too, was assigned a criminal history category of I by the Probation Office since he has no prior convictions. This assessment results in an imprisonment range of 135 to 168 months. The Presentence Report also indicates a fine range of $17,500 to $14,473,063 and a required period of supervised release of at least two but not more than three years.

### F. Sentencing Motions

Defendants' main arguments regarding the Presentence Report Guidelines calculations pertain to: (1) the upward adjustment based upon knowledge of the source of the monies received; (2) the amount of money actually involved in the offenses of conviction; (3) the correct base offense level to be used for the conspiracy counts; and (4) the supervisory role adjustment. Blarek argues that he does not deserve an enhancement based upon obstruction of justice.

Defendants have also moved for downward departures on a number of grounds. They include: (1) alleged vulnerability to abuse if incarcerated; (2) duress as a cause of the offense conduct; (3) conduct that falls outside of the "heartland" of prosecutions; (4) family circumstances; and (5) defendants' purported "reduced culpability" for engaging in money laundering conduct that did not become criminal until 1986, a number of years after they had already commenced their "work" for Santacruz. Separately Pel-lecchia requests a reduction in sentence due to his illness—Human Immunodeficiency Virus (HIV).

## III. Law

### A. Sentencing Statute: 18 U.S.C. § 3553

#### 1. Sufficient But Not Greater Than Necessary

■ Congress restructured the federal sentencing law in the 1980's to create the current Guidelines-based system. See Sentencing Reform Act of 1984, Pub.L. No. 98–473, § 211, 98 Stat.1987, 1989–90 (1984). It expressly stated that courts "shall impose a sentence sufficient, but not greater than necessary," to comply with the purposes of criminal sanctions. 18 U.S.C. § 3553(a). Harshness greater than that required is statutorily prohibited by this portion of the Sentencing Reform Act. Excessive leniency is also forbidden.

#### 2. Seriousness of the Offense, Adequate Deterrence, Protection of the Public, and Correctional Treatment

The Sentencing Reform Act went on to explicitly delineate the purposes of criminal sanctions. Section 3551(a) provides that every defendant "shall be sentenced ... so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case."

Subparagraphs (A) through (D) of section 3553(a)(2) instruct courts to consider the necessity of the sentence imposed:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other, correctional

treatment in the most effective manner.

18 U.S.C. § 3553(a)(2)(A)–(D).

■ As analyzed in Parts III B and C, *infra*, (A) above largely constitutes a summary of the just deserts theory and (B), (C), and (D) encompass utilitarian concerns. In creating the sentencing statutes, "Congress spelled out the four traditional justifications of the criminal sentence—deterrence, incapacitation, retribution and rehabilitation—and expressly instructed the sentencing court to keep these purposes in mind . . . ." Kenneth R. Feinberg, *The Federal Guidelines as the Underlying Purposes of Sentencing*, 3 Fed.Sent.Rep. 326, 326 (May/June 1991).

When enforcing the complex federal sentencing scheme, courts are required to consider six factors, subsidiary to the traditional sentencing rationales set out above. *See* 18 U.S.C. § 3553(a)(1)–(7). These are: (a) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (b) "the kinds of sentences available"; (c) "the kinds of sentence and the sentencing range established" by the Sentencing Guidelines; (d) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"; (e) "any pertinent policy statement issued by the Sentencing Commission"; and (f) "the need to provide restitution to any victims of the offense." 18 U.S.C. 3553(a)(1), (3)–(7).

To understand how these statutory provisions should be applied, a brief review of the theory and background of the purposes of criminal sentences is required.

## B. *Traditional Sentencing Rationales*

Sentencing is a critical stage of a criminal prosecution. *See Gardner v. Florida*, 430 U.S. 349, 358, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). It represents an important moment in the law, a "fundamental judgment determining how, where, and why the offender should be dealt with for what may be much or all of his remaining life." Marvin E. Frankel, *Criminal Sentences* vii (1973). It is significant not only for the individual before the court, but for his family and friends, the

victims of his crime, potential future victims, and society as a whole.

Four core considerations, in varying degrees and permutations, have traditionally shaped American sentencing determinations: incapacitation of the criminal, rehabilitation of the offender, deterrence of the defendant and of others, and just deserts for the crime committed. *See, e.g., Harmelin v. Michigan*, 501 U.S. 957, 999, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) ("The federal and state criminal systems have accorded different weights at different times to the penological goals of retribution, deterrence, incapacitation, and rehabilitation.") (Kennedy, J., concurring); *United States v. Giraldo*, 822 F.2d 205, 210 (2d Cir.) ("The proper purposes of the sentencing of criminal offenders are generally thought to encompass punishment, prevention, restraint, rehabilitation, deterrence, education, and retribution."), *cert. denied*, 484 U.S. 969, 108 S.Ct. 466, 98 L.Ed.2d 405 (1987); *see also* Charles E. Torcia, *1 Wharton's Criminal Law* § 1, at 2–3 (15th ed.1993) ("The principle theories of punishment are retribution, deterrence, and reformation."); Andrew R. Klein, *Alternative Sentencing: A Practitioner's Guide* 1 (1988) ("retribution, reparations, deterrence, and incapacitation, in addition to rehabilitation" are traditional sentencing goals); Andrew von Hirsch, *Doing Justice: The Choice of Punishments* xxviii–xxix (1976) (describing restraint of the criminal, deterrence, rehabilitation, and desert as traditional "aims to be served in deciding how the law should respond to law breakers"); *see generally* Sanford H. Kadish and Stephen J. Schulhofer, *Criminal Law and Its Processes* 113–65 (5th ed.1989) (compilation of materials addressing the purposes punishment is thought to serve). "Over the last two hundred years, courts have witnessed significant changes in sentencing policy, which have been shaped by the priorities assigned to [these] four competing sanction goals. . . ." Theresa Walker Karle & Thomas Sager, *Are the Federal Sentencing Guidelines Meeting Congressional Goals?: An Empirical and Case Law Analysis*, 40 Emory L.J. 393, 393 (1991); *see also* Arthur W. Campbell, *Law of Sentencing* §§ 1:1, 1:2, 1:3, at 1–16 (1991) (history and

development of sentencing goals and practices).

Ascertaining priorities among these potentially conflicting notions has long been a point of contention amongst legislators, scholars, jurists, and practitioners. Somewhat oversimplifying, there are two basic camps. Retributivists contend that "just deserts" are to be imposed for a crime committed. Utilitarians, in their various manifestations, suggest that penalties need to be viewed more globally by measuring their benefits against their costs. "The debate between the desert justification and the various utilitarian justifications such as deterrence, incapacitation, and rehabilitation has continued to divide criminal law thinkers...." Paul H. Robinson & John M. Darley, *The Utility of Desert*, 91 Nw.U.L.Rev. 453, 455 (1997).

Implied in this debate are questions about our basic values and beliefs:

> Why do we impose punishment? Or is it properly to be named "punishment"? Is our purpose retributive? Is it to deter the defendant himself or others in the community from committing crimes? Is it for reform? rehabilitation? incapacitation of dangerous people? Questions like these have engaged philosophers and students of the criminal law for centuries.

*Criminal Sentences, supra,* at 7 (1973); *see also, e.g.,* Matthew A. Pauley, *The Jurisprudence of Crime and Punishment from Plato to Hegel,* 39 Am.J.Juris. 97, 99 (1994) ("Very few contemporary books or articles on punishment tell us much about how some of the great philosophers approached these questions....").

In the nineteenth and most of the twentieth century American prison and punishment system reforms were designed primarily to rehabilitate the prisoner as a protection against further crime. *See* Adam J. Hirsch, *The Rise of the Penitentiary: Prisons and Punishment in Early America* 114 (1992) ("Carceral ideology was conventional in that it remained focused on the goal of crime control [and] socially progressive, in that it sought to reduce offenses by enabling criminals to better themselves."). In more recent years there has been a perception by many that attempts at rehabilitation have failed; a

movement towards theoretically-based, more severe, fixed punishments, based upon the nature of the crime gained momentum. *See Law of Sentencing, supra,* at 32 ("by 1990 rehabilitation was replaced by retribution as the dominant sentencing rationale in this country"). Two eighteenth and nineteenth century philosophers set the terms of the current late twentieth century debate.

### 1. *Kant's Retributive Just Deserts Theory*

Immanuel Kant, born in East Prussia in 1724, is regarded by some as "one of the most important philosophers in Western culture." Diane Collinson, *Fifty Major Philosophers: A Reference Guide* 89 (1992); *see also, e.g.,* Immanuel Kant, *Critique of Pure Reason* (Vasilis Politis ed. & trans., Everyman's Library 1994)(1781); Immanuel Kant, *The Moral Law (Kant's Groundwork of the Metaphysics of Morals),* (H.J. Paton ed. & trans., Hutchinson Univ. Library 3d ed.1965) (1785). On the ascendency of law, he wrote:

> Duty is the necessity to act out of reverence for the law.... Thus, the moral worth of an action does not depend on the result expected from it, and so too does not depend on any principle of action that needs to borrow its motive from this expected result ... nothing but the idea of law in itself ... can constitute that preeminent good which we call moral, a good which is already present in the person acting on this idea....

*The Moral Law, supra,* at 68–69 (italics omitted). It is said that "Kant accepted as fundamental the principle ... that the only absolutely good thing in the universe is the human will governed by respect for the moral law or the consciousness of duty." S.E. Frost, Jr., *Basic Teachings of the Great Philosophers* 94 (Anchor Books rev. ed.1989). Kant's anti-utilitarian thesis on criminal penalties is reflected in an oft-cited passage from his work, *The Metaphysical Elements of Justice:*

> Juridical punishment can never be used merely as a means to promote some other good for the criminal himself or for civil society, but instead it must in all cases be imposed on him only on the ground that he

has committed a crime; for a human being can never be manipulated merely as a means to the purposes of someone else and can never be confused with the objects of the Law of things....

Immanuel Kant, *The Metaphysical Elements of Justice (Part I of The Metaphysics of Morals )* 100 (John Ladd ed. & trans., Bobbs–Merrill Co., 1965) (1797). It follows from this position that the sole justification for criminal punishment is retribution or "jus talionis." *See* Huntington Cairns, *Legal Philosophy from Plato to Hegel* 453 (4th prtg. 1966); *see also* Leon Pearl, *A Case Against the Kantian Retributivist Theory of Punishment: A Response to Professor Pugsley,* 11 Hof.L.R. 273, 274 (1982) ("Immanuel Kant ... held that only a retributivist theory is properly responsive to the criminal's dignity as a rational agent capable of moral conduct, a dignity which he retains despite his commission of a legal offense.").

The average man or woman on the streets of New York, struggling to exist with some dignity, would hardly recognize as words to live by Kant's merciless doctrine: .

> The law concerning punishment is a categorical imperative, and woe to him who rummages around in the winding paths of a theory of happiness looking for some advantage to be gained by releasing the criminal from punishment or by reducing the amount of it—in keeping with the Pharisaic motto: "It is better that one man should die than the whole people should perish." If legal justice perishes, then it is no longer worth while for men to remain alive on this earth.

*Metaphysical Elements of Justice, supra,* at 100.

For Kant and his adherents, "[p]unishment that gives an offender what he or she deserves for a past crime is a valuable end in itself and needs no further justification." *The Utility of Desert, supra,* at 454. "It is not inflicted because it will give an opportunity for reform, but because it is merited." Edmund L. Pincoffs, *The Rationale of Legal Punishment* 7 (1966). Kantian "just deserts" theory, therefore, focuses almost exclusively on the past to determine the level of punishment that should be meted out to right the wrong that has already occurred as a result of the defendant's delict. *See Pauley The Jurisprudence of Crime and Punishment from Plato to Hegel, supra,* at 97.

Some softening of this cold and relentless rigidity by simultaneously integrating the Benthamite utilitarian approach is possible.

### 2. Bentham's Utilitarian Theory

Jeremy Bentham, an English philosopher born in 1748, advocated a far different, more prospective approach through his "Principle of Utility." *Fifty Major Philosophers, supra,* at 94. For him, law in general, and criminal jurisprudence in particular, was intended to produce the "greatest happiness for the greatest number," a concept sometimes referred to as the "felicity calculus." *Id.*

This is not to say that Bentham did not believe in sanctions. It was his view that punishment was sometimes essential to ensure compliance with public laws. *See* Jeremy Bentham, *Bentham's Political Thought* 167–68 (Bhikhu Parekh ed., Harper & Row 1973) ("For the most part it is to some pleasure or some pain drawn from the political sanction itself, but more particularly ... to pain that the legislator trusts for the effectuation of his will."); *see also* Sanford H. Kadish and Stephen J. Schulhofer, *Criminal Law and its Processes* 144 (5th ed. 1989) ("Bentham sees punishment as the deliberate infliction of pain and suffering but justifies it as a necessary evil when the good it produces overall outweighs its harmful effects.").

Unlike his contemporary, Kant, Bentham was not interested in criminal punishment as a way of avenging or canceling the theoretical wrong suffered by society through a deviation from its norms. Rather, a criminal sanction was to be utilized only when it could help ensure the greater good of society and provide a benefit to the community. *See Rationale of Legal Punishment, supra,* at 20 (criminal penalties, like other legislation, are meant to further the contentment of society). Bentham's writings in *An Introduction to the Principles of Morals and Legislation* explain this theory:

... all punishment is mischief: all punishment in itself evil. Upon the principle of utility, if it ought at all to be admitted, it ought only to be admitted in as far as it promises to exclude some greater evil ... in the following cases punishment ought not to be inflicted.

I. Where it is groundless: where there is no mischief for it to prevent: the act not being mischievous upon the whole.

II. Where it must be inefficacious: where it cannot act so as to prevent the mischief.

III. Where it is unprofitable, or too expensive: where the mischief it would produce would be greater than what it prevented.

IV. Where it is needless: where the mischief may be prevented, or cease of itself, without it: that is, at a cheaper rate....

Jeremy Bentham, *An Introduction to the Principles of Morals and Legislation,* excerpted in *The Great Legal Philosophers: Select Readings in Jurisprudence* 262, 270 (Clarence Morris ed., 1959).

Under the Benthamite approach, deterring crime, as well as correction and reformation of the criminal, are primary aspirations of criminal law. *See The Jurisprudence of Crime and Punishment from Plato to Hegel, supra,* at 136; *see also United States v. Cordoba–Hincapie,* 825 F.Supp. 485, 493 (E.D.N.Y.1993) (Bentham focused upon proportionality and deterrence as goals of sentencing). While "the theory of retribution would impose punishment for its own sake, the utilitarian theories of deterrence and reformation would use punishment as a means to [a practical] end—the end being community protection by the prevention of crime." *Wharton's Criminal Law, supra,* at 3.

### 3. *Sanctions in Strict Retributive and Utilitarian Models*

Given the divergence in underlying assumptions and theory, the competing retributivist and utilitarian theories suggest opposing methods for ascertaining proper penalties. Under a Kantian model, the extent of punishment is required to neatly fit the crime. "Whoever commits a crime must be punished in accordance with his desert." *Pincoffs The Rationale of Legal Punishment, supra,* at 4.

In the case of murder, some believe that just desert is clear. A taker of life must have his own life taken. *Great Legal Philosophers, supra,* at 258 ("Whoever has committed Murder, must die."). Even in the case of killings, however, there are degrees of mens rea, and over large portions of the world capital punishment is outlawed on a variety of just deserts and utilitarian grounds. *See* Herbert Wechsler & Jerome Michael, *The Rationale of the Law of Homicide I,* 34 Colom.L.Rev. 701, 760 (1937) (criminal law must distinguish among the various kinds of homicide to avoid "gratuitous cruelty" in sentencing); *Cf.* Alan I. Bigel, *Justices William J. Brennan, Jr. and Thurgood Marshall on Capital Punishment: Its Constitutionality, Morality, Deterrent Effect, and Interpretation by the Court,* 8 Notre Dame L.J. Ethics & Pub. Pol'y 11, 44 (1994) (statistics show that utilization of death penalty does not significantly lower murder rate).

For lesser offenses, reaching a consensus on the proper "price" for the criminal act under the Kantian approach is even more difficult. As one scholar has written:

The retributivist can perhaps avoid the question of how we decide that one crime is morally more heinous than another by hewing to his position that no such decision is necessary so long as we make the punishment "equal" to the crime. To accomplish this, he might argue, it is not necessary to argue to the relative wickedness of crimes. But at best this leaves us with the problem of how we do make punishments equal to crimes, a problem which will not stop plaguing retributivists.

Edmund L. Pincoffs, *The Rationale of Legal Punishment, supra,* at 16.

Two main theoretical problems are presented by this just deserts approach. The degree of the earned desert—that is to say the extent or length of the appropriate punishment—is subjective. The upper and lower limits of the punishment can be very high

or very low, justified on personal views and taste. The "earned" punishment may be quite cruel and do more harm to society, the criminal, and his family, than can be justified on utilitarian grounds.

Determining the appropriateness of sanction differs under Bentham's utilitarian approach, although it too poses challenging theoretical and practical tasks for the sentencer. Under this model, among:

> the factors ... [to be considered] are the need to set penalties in such a way that where a person is tempted to commit one of two crimes he will commit the lesser, that the evil consequences ... of the crime will be minimized even if the crime is committed, that the least amount possible of punishment be used for the prevention of a given crime.

*See The Rationale of Legal Punishment, supra*, at 23. Obviously, one problem with utilizing a system based only upon this approach is that "[i]t is difficult ... to determine when more good than harm has been achieved...." *United States v. Concepcion*, 795 F.Supp. 1262, 1272 (E.D.N.Y.1992).

As in the case of Kantian just deserts, the felicity calculation is subject to considerable difficulty and dispute. Another major problem with the utilitarian approach is that the individual criminal can be treated very cruelly, to gain some societal advantage even through the crime is minor—or very leniently, despite the shocking nature of the crime—if that will on balance benefit society.

Given these problems, it may make sense to continue to equivocate, oscillating between these poles, tempering justice with mercy, just deserts with utility calculations, in varying pragmatic ways. "Pragmatism," one of the hallmarks of the American political and legal system, itself suggests a leaning toward utilitarianism. *See Webster's New Twentieth Century Dictionary* (William Collins ed., 2d ed.1979) ("in philosophy [pragmatism] ... tests the validity of all concepts by their practical results").

### C. Utility and Retribution Under Sentencing Guidelines

The Sentencing Guidelines, written by the United States Sentencing Commission pursu-

ant to the Sentencing Reform Act, *see* Pub.L. 98–473, § 217, 98 Stat.1987, 2019 (1984), purport to comport with the competing theoretical ways of thinking about punishment. The Guidelines state that they provided "for the development of guidelines that will further the basic purposes of criminal punishment: deterrence, incapacitation, just punishment, and rehabilitation." *See* U.S.S.G. Chap. 1, Pt. A(2). A systematic, theoretical approach to these four purposes was not, however, employed by the Commission:

> A philosophical problem arose when the Commission attempted to reconcile the differing perceptions of the purposes of criminal punishment. Most observers of the criminal law agree that the ultimate aim of the law itself, and of punishment in particular, is the control of crime. Beyond this point, however, the consensus seems to break down. Some argue that appropriate punishment should be defined primarily on the basis of the principle of "just deserts." Under this principle, punishment should be scaled to the offender's culpability and the resulting harms. Others argue that punishment should be imposed primarily on the basis of practical "crime control" considerations. This theory calls for sentences that most effectively lessen the likelihood of future crime, either by deterring others or incapacitating the defendant.

U.S.S.C. Ch. 1, Pt. A(3) (The Basic Approach). The Commission decided not to create a solely retributivist or utilitarian paradigm, or "accord one primacy over the other." U.S.S.G. Ch. 1, Pt. A(3) (The Basic Approach); *see also* Dale G. Parent, *What Did the United States Sentencing Commission Miss?*, 101 Yale L.J. 1773, 1778 (1992) (the Commission "did not articulate the purposes that ought to govern future sentencing, and as a result, it could not structure its guidelines to achieve particular results").

It is claimed that, "[a]s a practical matter this choice [between the competing purposes of criminal punishment] was unnecessary because in most sentencing decisions the application of either philosophy will produce the same or similar results." *Id.* This premise is flawed. In practice, results may vary widely

depending upon theory. A penalty imposed based upon pure utilitarian considerations would hardly ever be identical to one that was imposed in a pristine retributive system. While it cannot be said that one is always harsher than the other, seldom would their unrestrained application produce the same sentence. *Cf.* David Dolinko, *Three Mistakes of Retibutivism,* 39 UCLA L.Rev. 1623, 1626 (under the retributive theory, "[p]unishment involves the deliberate imposition of suffering on persons convicted of crime"). *But see The Utility of Desert, supra,* at 454 ("while the underlying rationales of the two views may be irreconcilable, their practical applications, properly done, suggest similar distributions of liability and punishment").

### D. *Deference to Sentencing Judge on Guidelines' Critical Sentencing Issues*

Since the Sentencing Commission did not say how competing rationales should shape individual sentencing decisions, courts are left to make that judgment. *See* Marc Miller, *Purposes at Sentencing,* 66 S.Cal.L.Rev. 413, 448–49 (1992) ("It is hard to reconcile § 3553(a) [dealing with the purposes of sentencing] of the Act and the Commission's application instructions in guideline section 1B1.3 [dealing with determination of the applicable Guidelines range]").

The Sentencing Commission eschewed analysis in creating the Guidelines. Utilized was a statistical compilation of prior sentences as a substitute for study and evaluation. *Cf. Criminal Sentences, supra,* at 7 ("Our Congress and state legislatures have failed even to study and resolve the most basic of the questions affecting criminal penalties, the questions of justification and purpose ... these problems as to the purposes of criminal sanctions are, or should be, at the bedrock of any rational structure of criminal justice.").

In writing the initial Guidelines, the Commission "sought to solve both the practical and philosophical problems of developing a coherent sentencing system by taking an empirical approach that used as its starting point data estimating pre-guidelines sentencing practice." U.S.S.G. Ch. 1, Pt. A(3). It contended that this:

empirical approach ... helped resolve its philosophical dilemma. Those who adhere to a just deserts philosophy may concede that the lack of consensus might make it difficult to say exactly what punishment is deserved for a particular crime. Likewise, those who subscribe to a philosophy of crime control may acknowledge that the lack of sufficient data might make it difficult to determine exactly the punishment that will best prevent that crime. Both groups might therefore recognize the wisdom of looking to those distinctions that judges and legislators have, in fact, made over the course of time. These established distinctions are ones that the community believes, or has found over time, to be important from either a just deserts or crime control perspective.

U.S.S.G. Ch. 1, Pt.A (3). This statistically based foundation has proven inadequate to administer individual criminal litigations except in "routine" cases upon which there may be a "consensus."

Reaching a consensus is difficult. Although the drafters of the Guidelines deviated from pre–Guidelines practices in some instances where they believed public policy dictated, for example in the creation of extraordinarily harsh penalties for drug offenses, *id.,* the degree of severity does not appear to be fully supported by public sentiment. *See, e.g.,* Linda Drazga Maxfield et al., *Just Punishment: Public Perceptions and the Federal Sentencing Guidelines (Research Bulletin)* 3 (U.S. Sentencing Commission 1997)(69.2% of over 1700 people surveyed believed that persons convicted of trafficking crack cocaine should be sentenced below the Sentencing Guideline range). Current research supports the view that present federal sentencing practices, leaning towards lengthy periods of incarceration, are perceived as unnecessarily harsh. *See, e.g.,* Julian V. Roberts, *American Attitudes About Punishment: Myth and Reality, in Sentencing Reform in Overcrowded Times* 250, 254 (Michael Tonry & Kathleen Hatlestad, ed.1997) (study "results suggest that increased use of alternatives to incarceration can proceed without fear of widespread public opposition ..."); The Report of the Na-

tional Criminal Justice Commission, *The Real War on Crime* 60–61 (Steven R. Donziger, ed., 1996) ("Most Americans prefer punishments outside of prison for many types of nonviolent offenders if they are available."). As the huge increase in costs to taxpayers of excessive sentences come to be appreciated, it can be expected that a rational public will be even less approving of an anti-crime program largely ignoring utilitarian amelioration.

The Sentencing Commission claimed that "[t]he guidelines may prove acceptable ... to those who seek more modest, incremental improvements in the status quo, who believe the best is often the enemy of the good, and who recognize that the guidelines are, as the [Sentencing Reform] Act contemplates, but the first step in an evolutionary process." U.S.S.G. Ch.1, Pt.A(3). Based on its continuing observation of the courts' actions, revisions to the Guidelines were to occur. U.S.S.G. Ch.1, Pt. A(2) (The Statutory Mission). Since the inception of the Guidelines in 1987, however, little change or improvement has taken place.

Modification seems unlikely given the present self-fulfilling arrangement. That is, courts, constrained by the Guidelines, tend not to deviate from them. As a result, the bulk of sentences fall within the current delineated Guidelines range. "Experiences" of the courts are, therefore, a forced Guidelines experience—falsely suggesting vindication of the original determinations of the Commission.

Moreover, as indicated by recent rejection of attempts to reduce differences in Guideline penalties for selling crack as opposed to other forms of cocaine, current political views make difficult any moderation of the Guidelines by the Commission. *See, e.g.,* United States Sentencing Commission, *Federal Sentencing Policy* 192 (1995) (suggesting that the current use of the 100 to 1 sentencing ratio for crack cocaine offenses as compared to powder cocaine crimes is unfair); Federal Sentencing Guidelines, Amendment, Disapproval, Pub.L. No. 104–38, 109 Star. 334, 334–35 (1995) (rejecting the Sentencing Commission's proposed changes for reduction of the sentencing disparity between crack and powder cocaine offenses); *see also* Rod Morgan & Chris Clarkson, *The Politics of Sentencing Reform, in The Politics of Sentencing Reform* 1, 3 (Chris Clarkson & Rod Morgan ed.1995) ("party political calculation" shapes sentencing policies); Anthony N. Doob, *The United States Sentencing Commission Guidelines, in The Politics of Sentencing Reform* 199, 211 (Sentencing Reform Act to be viewed in light of the "political context in which it was written").

Judges, by and large, believe that the Guidelines are too rigid and harsh. Molly Treadway Johnson & Scott A. Gilbert, *The U.S. Sentencing Guidelines: Results of the Federal Judicial Center's 1996 Survey* 3 (Federal Judicial Center 1997) (federal judges "strongly prefer a system in which judges are accorded more discretion than under the current guidelines"). To the extent that district judges have exercised discretion in the face of the Guidelines and imposed sentences based upon humane considerations they consider relevant, individualization places many defendants below the excessively high penalties dictated by the Guidelines regime. *See, e.g. United States v. Caba,* 911 F.Supp. 630 (E.D.N.Y.1996) (sentence based upon lower guideline range for food stamp fraud rather than money laundering, the crime of conviction; former more accurately reflected defendant's actual wrongdoing); *United States v. Rose,* 885 F.Supp. 62 (E.D.N.Y.1995) (providing support to grandmother and second cousins warranted lower sentence than that provided for under the Guidelines); *United States v. Libutti,* 1994 WL 774647 (D.N.J. Dec.23, 1994) ("defendant's combination of physical and mental conditions" presented extraordinary situation calling for reduced penalty); United States v. Naylor, 735 F.Supp. 928 (D.Minn. 1990) (downward departure from Guidelines granted where defendant committed crime while being "purposefully exploited by a manipulative lover 15 years her senior"); *see also* United States Sentencing Commission, *1996 Sourcebook of Federal Sentencing Statistics* 39 (1997) (substantial assistance and other downward departures granted in almost 30% of the cases in 1996).

A fully comprehensive sentencing system that provides an absolute balance between the various sentencing rationales while permitting sentencing judges the appropriate level of discretion is probably not attainable. *Cf. A Case Against the Kantian Retributivist Theory, supra,* at 276 (no system "currently exists [that provides] a fully satisfactory theory that both justifies punishment and provides a basis for just sentencing"). The creation of a flawless system is not a realistic goal. Yet the states with sentencing guidelines have created systems that appear much more reasonable than the current federal structure. *See* Richard S. Frase, *Sentencing Guidelines Are "Alive and Well" in the United States, in Sentencing Reform in Overcrowded Times* (Michael Tonry & Kathleen Hatlestad eds., 1997) ("State guidelines ... tend to reflect a better balance than the federal guidelines on such key sentencing issues as the relative weight to be given to offense versus offender variables; the amount of remaining judicial discretion: the degree of sanction severity" and other factors); *see also, e.g.,* Ark.Code Ann. § 16–90–804 (judges may deviate from sentencing grid within a certain range without written justification); Minn.Stat. § 244.09 ("sentencing guidelines are advisory to the district court"); Wash.Rev.Code § 9.94A.010 (guidelines system "structures, but does not eliminate, discretionary decisions affecting sentences"); *see generally* 6 Fed.Sent.Rep. 123-68 (Nov./Dec.1993) (collection of articles relating to state sentencing guidelines); David Boerner, *The Role of the Legislature in Guidelines Sentencing in "The Other Washington",* 28 Wake Forest L.Rev. 381 (1993) (discussing Washington State's sentencing guidelines); Dale G. Parent, *What Did the United States Sentencing Commission Miss?,* 101 Yale L.J. 1773 (1992) (comparing the Federal Sentencing Guidelines to those of the state of Minnesota).

The foreign experience may also be instructive. *See, e.g.,* Andrew von Hirsch, *Sentencing Reform in Sweden in Sentencing Reform in Overcrowded Times* 211, 213 (Sweden's modified just deserts program is "based upon statutory rules, principles, and presumptions rather than on numeric grids"); Andrew von Hirsch, *Guiding Principles for Sentencing: The Proposed Swedish Law,* Crim.L.Rev. 746 (1987), *excerpted in Principled Sentencing* 292, 292 (Andrew von Hirsch and Andrew Ashworth ed., 1992) (development of Swedish system); *see generally* 7 Fed.Sent.Rep. 270–311 (1995) (compilation of articles relating to sentencing in European countries). It is claimed that Swedish "[s]entencers seem to be engaging more frequently in the kind of explicit reasoning the statute is designed to promote—that is, discussion of such issues as how great the offense's penal value is, what mitigating or aggravating factors (if any) are present, [and] whether the prior criminal record is sufficient to adjust the penalty...." *Sentencing Reform in Sweden, supra,* at 214. Overall the system is primarily based on a just deserts theory. It is unclear just how successful the new retribution-based Swedish laws have been or if they will last given reported changes in the political atmosphere. *Id.* at 214–15. Much depends on length of prison terms and utilization of non-custodial sentences.

### E. *Application of the Guidelines*

Until broad-based transformation of the current complex federal system takes place, individual judges have a duty under the statutes to consider all traditional purposes of sentencing when determining an appropriate penalty. "Such [p]urpose-based analysis by judges may be the best hope for bringing justification to sentences imposed in the federal guideline system." *Purposes at Sentencing, supra,* at 478; *see also Wharton's Criminal Law, supra,* at 19–20 ("[i]t is for the sentencing judge to decide on a case-by-case basis which theory is to be accorded priority"); Wayne R. LaFave & Austin W. Scott, Jr., *Criminal Law* § 5, at 24–25 (1972) (because of conflicts in sentencing rationales, "the judges ... who must sentence the convicted defendant within the limits set forth in legislation ... must determine priorities"); *see generally Koon v. United States,* 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) (traditional discretion of trial court in sentencing).

### 1. *Heartland*

The Guidelines established base offense levels for criminal acts, representing an as-

sessment of the quantity of punishment required for the "average" crime of that sort. As a result, "sentencing courts [are] to treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes." U.S.S.G. Ch. 1, Pt.A (4)(b). What this means, the Supreme Court has recently explained, is that "[a] district judge now must impose on a defendant a sentence falling within the range of the applicable Guideline, *if the case is an ordinary one.*" *Koon v. United States,* 518 U.S. 81, 92, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) (emphasis added).

■ The Guidelines, while intended to ensure "a more honest, uniform, equitable, proportional, and therefore effective sentencing system," U.S.S.G. Ch. 1, Pt.A (3), must not be interpreted as eliminating judicial sentencing discretion. *See Koon,* 518 U.S. at 92, 116 S.Ct. 2035 ("The Act did not eliminate all of the district court's discretion . . ."). The traditional task of imposing a just and fair sentence based upon an independent view integrating all philosophical, statutory, Guidelines and individual particulars of the case at hand remains the job of the nisi prius judge.

### 2. *Departures*

Congress provided for judicial departure from the Sentencing Guidelines whenever a "court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b); *see also* Thomas W. Hutchinson, et al., *Federal Sentencing Law and Practice* 14 (1997) (given the language of 18 U.S.C. § 3553(b), "the decision would seem necessarily to be judicial" as to whether and when departure is appropriate under the Guidelines, and outside the purview of the Sentencing Commission).

In the same way that the Commission could not have foreseen every type of criminal case, it could not have foretold every potential ground justifying departing from the Guidelines. *See Koon,* 518 U.S. at 83, 116 S.Ct. 2035 ("Commission chose to prohib-

it consideration of only a few factors, and not otherwise to limit, as a categorical matter, the considerations which might bear upon the decision to depart."); *see also* U.S.S.G. § 5K2.0 ("Circumstances that may warrant departure from the guidelines pursuant to this provision cannot, by their very nature, be comprehensively listed and analyzed in advance."). Except perhaps for a limited few grounds that the Commission has expressly stated should not be considered as reasons for departing, it "does not intend to limit the kind of factors, whether or not mentioned anywhere else in the guidelines, that could constitute grounds for departure in an unusual case." U.S.S.G. Ch. 1, Pt.A (4)(b).

■ Courts must fully consider in each case whether departure from the Guidelines' sentencing chart is appropriate. This task is addressed in Part IV, *infra.*

## IV. *Law Applied to Facts*

### A. *Guidelines Computations*

Based upon the evidence presented at trial and the sentencing hearing, a number of determinations on applicable Guidelines criteria are required.

### 1. *Base Offense Level*

■ The first question to be addressed is the correct level to be used to determine the adjusted base offense level for the conspiracy counts. This is a complicated issue. Defendants were convicted of multi-object conspiracies under section 1962(d) (count two—Racketeering Conspiracy) and sections 371 and 1956(h) (count three—Money Laundering Conspiracy). The defense did not request, and the jury did not make, any specific findings as to the objects of the conspiracies. The underlying objects for count two, the Racketeering Conspiracy, include two provisions relating to Money Laundering, *see* 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1957, as well as Interstate Travel in Aid of Racketeering. *See* 18 U.S.C. § 1952. The underlying objectives for count three, the Money Laundering Conspiracy charge, are three provisions relating to money laundering. *See* 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B)(i), and 1957.

Each one of the "objects" for each of the counts have differing base offense levels under the Sentencing Guidelines. Section 1956(a)(1)(A)(i) carries a base offense level of 23, section 1956(a)(1)(B)(i) a base offense level of 20, and section 1957 a base offense level of 17. The base offense level for Interstate Travel in Aid of Racketeering is determined by the conduct underlying the Racketeering—here, money laundering. The government and defendants agree that Guideline offense level 23 for section 1956(a)(1)(A)(i) is not relevant or applicable given the evidence at trial. While this conclusion does not seem ordained by the relevant Guidelines provisions, there is no reason to force a more harsh sentence than the government seeks.

The evidence at trial proved beyond a reasonable doubt that defendants conspired to violate both section 1956(a)(1)(B)(i) and section 1957. A sentence that correctly reflects this determination is necessary. *See* U.S.S.G. § 1B1.2(d) and cmts. 4 & 5 (where a jury verdict does not establish which offenses were the objects of a conspiracy, the court makes the determination); *see also United States v. Malpeso*, 115 F.3d 155, 168 (2d Cir.1997) (holding constitutional U.S.S.G. § 1B1.2(d)). Base offense level 20 is the highest applicable offense level; it must be utilized for purposes of grouping Guidelines and computing the total adjusted offense level. Even if such a finding were incorrect, given the appropriate sentence for these defendants, discussed in Part IV C, *infra*, whether 17 or 20 is the highest applicable base offense level would not affect the sentences.

### 2. *Knowledge of Drug Trafficking Source*

■ The claim that defendants were unaware of the source of the funds they received from Santacruz is without merit. They were fully informed of the fact that their client was a notorious drug trafficker. Though Santacruz may not have communicated this fact explicitly to defendants, they learned who he was shortly after they began to work for him. Even had they consciously avoided learning the full truth regarding the funds' genesis, they were sufficiently aware of the criminal source to warrant punishment as if they had full knowledge. *See United States v. Gamez*, 1 F.Supp.2d 176, 181 (E.D.N.Y.1998). In any event, clear and convincing evidence demonstrated actual knowledge that they were laundering drug monies. Each defendant must receive a three point enhancement for specific knowledge of drug relatedness. U.S.S.G. § 2S1.1(b)(1).

### 3. *Amount of Funds*

■ The Probation Department's specific offense characteristic computations relating to the amount of funds involved in the illegality after 1986—at least $5.5 million—is accurate. U.S.S.G. § 2S1.1(b)(2)(H). While the total amount of money defendants received from Santacruz is over $8 million, it would be inappropriate to count as relevant conduct the funds "laundered" prior to the enactment of the Money Laundering Act of 1986. *See* Money Laundering Control Act of 1986, Pub.L. 99–570, § 1351, 100 Stat. 3207–18 (1986) (amending Title 18 to create new offenses for laundering of monetary instruments at sections 1956 and 1957). Defendants knew, very early on in their relationship with Santacruz, what he did to earn his money. All funds received from him after October, 1986, whether in the form of cash, wire transfer, or otherwise, must be used to compute the relevant offense conduct. *See* U.S.S.G. § 1B1.3(a) (penalized for all relevant activity).

### 4. *Supervisory Role*

■ Contrary to defendant Blarek's suggestion, he has earned an enhancement for his supervisory role in the offense. This finding is based upon his supervision of his secretary, his accountant, a consolidator who shipped goods to Santacruz, and his co-defendant Pellecchia. The government did not prove that five or more participants in the crimes were supervised by Blarek or that the scheme was sufficiently extensive to otherwise warrant a three point enhancement. *See* U.S.S.G. § 3B1.1(b).

A two point enhancement is appropriate. *See* U.S.S.G. § 3B1.1(c). Blarek decided on the details of the scheme and how it was to be executed. Since Pellecchia was not a

supervisor, he is not subject to a role enhancement.

### 5. Obstruction of Justice

 Probation's' Presentence Report recommends that defendant Blarek should incur an upward adjustment for obstruction of justice based upon perjury in his trial testimony. *See* U.S.S.G. § 3C1.1. The government's argument supporting this view is rejected. Blarek appeared to be forthright in his presentation. Inconsistencies in his testimony might be attributed to the tricks memory often plays when a person wishes the past were different from what it was. *See* U.S.S.G. § 3C1.1 cmt. 1 ("inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all ... reflect a willful attempt to obstruct justice"). An allegation of perjury is not supported. *See* U.S.S.G. § 3C1.1 cmt. 3(b) ("committing, suborning, or attempting to suborn perjury" warrant obstruction of justice enhancement); *United States v. Dunnigan*, 507 U.S. 87, 113 S.Ct. 1111, 1116–17, 122 L.Ed.2d 445 (1993) (clear finding of perjury required for enhancement under U.S.S.C. § 3C1.1 based upon defendant's alleged false testimony); *United States v. Onumonu*, 999 F.2d 43, 45–46 (2d Cir.1993) ("A district court may enhance a defendant's sentence for obstruction of justice if the defendant commits perjury."); *cf. United States v. Shonubi*, 895 F.Supp. 460, 526–27 (E.D.N.Y.1995) (arguing that a requirement of "automatic enhancement" upon a district court's finding of perjury undercuts sound policy and a defendant's constitutional right to testify), *vacated on other grounds*, 103 F.3d 1085 (1997).

### 6. Total Computations

Based upon these findings, defendant Blarek's total offense level should be reduced to 32, while defendant Pellecchia's is reduced to 30. Blarek faces a period of imprisonment of 121 to 151 months. Pellecchia faces 97 to 121 months' incarceration.

Even if the defendants or the government were correct in all of their assertions relating to the Guidelines computations, the sentences imposed in this case would have been the same for the reasons stated in Parts IV C and D, *infra.*

### B. Traditional and Statutory Sentencing Rationales

#### 1. Incapacitation

Incapacitation seeks to ensure that "offenders ... are rendered physically incapable of committing crime." Arthur W. Campbell, *Law of Sentencing* § 2:3, at 27–28 (1991). In colonial America, incapacitation was sometimes imposed in a literal sense. *Id.* at 28 (loss of organs). With the development of the penitentiary system, incarceration was seen as "a more reliable means of incapacitation." Adam J. Hirsch, *The Rise of the Penitentiary: Prisons and Punishment in Early America* 44 (1992).

In the instant case, incapacitation is not an important factor. First, these defendants have no prior criminal record indicating any propensity towards crime. Second, their connection to the criminal world, Santacruz, is now deceased. Third, it does not appear that long term restriction is necessary to ensure that defendants do not reenter a life of crime.

Consistent with utilitarian-driven analysis, little would be gained if the sentences emphasized incapacitation.

#### 2. Rehabilitation

Rehabilitation is designed to instill "in the offender proper values and attitudes, by bolstering his respect for self and institutions, and by providing him with the means of leading a productive life...." *Wharton's Criminal Law, supra,* at 18. Neither of these men is wayward or in need of special instruction on the mores of civilized society. They have in place strong community support systems, as evidenced by the many letters submitted to the court by family and friends. They know how to live a law abiding life. It is not required that a penalty be fashioned that teaches them how to be moral in the future. This criterion, rehabilitation, therefore, is not one that is useful in assessing a penalty.

### 3. Deterrence

Of the two forms of deterrence that motivate criminal penalties—general and specific—only one is of substantial concern here.

Specific deterrence is meant to "disincline individual offenders from repeating the same or other criminal acts." *Law of Sentencing, supra,* at 25. Such dissuasion has likely already occurred. Defendants regret their actions. The ordeal of being criminally prosecuted and publically shamed by being denominated felons and the imposition of other penalties has taught them a sobering lesson.

General deterrence attempts to discourage the public at large from engaging in similar conduct. It is of primary concern in this case. Defendants' activities have gained a great deal of attention. Notorious cases are ideal vehicles for capturing the attention of, and conveying a message to, the public at large. *Cf.* Donald R. Fretz, *Courts and the Public* 93 (National College of the State Judiciary 1973) ("The public . . . needs to know what the courts are and what they do . . . and how all of this serves the public."). While it is not appropriate under just deserts views for defendants in famous cases to be treated more harshly than defendants in less significant ones simply for the sake of making an example of them, under a utilitarian view the notoriety of particular a defendant may be taken into account by sentencing courts provided the punishment is not disproportionate to the crime. *Cf.* Herbert Wechsler and Jerome Michael, *A Rationale of the Law of Homicide I,* 37 Colom.L.Rev. 701, 747–49 (1937) ("Men must estimate the consequences of their acts on the basis of their knowledge before acting . . . the probable consequences of acts must be estimated by the kind of knowledge that men in general have or can acquire before they choose to act").

### 4. Retribution

Retribution is considered by some to be a barbaric concept, appealing to a primal sense of vengeance. *See Criminal Law, supra,* at 24. It can not, however, be overlooked as an appropriate consideration. When there is a perception on the part of the community that the courts have failed to sensibly sanction wrongdoers, respect for the law may be reduced. This is a notion applicable under both just deserts and utilitarian balancing concepts that has had some resurgence with the current growth of the rights of victims to be heard at sentencing. *See, e.g.,* 18 U.S.C. § 3555 (order of notice to victims). *But see* Susan Bandes, *Empathy, Narrative, and Victim Impact Statements,* 63 U.Chi.L.Rev. 361, 365 (1996) ("victim impact statements are narratives that should be suppressed because they evoke emotions inappropriate in the context of criminal sentencing").

Should punishment fail to fit the crime, the citizenry might be tempted to vigilantism. This may be why, according to one group of scholars, "a criminal law based on the community's perceptions of just deserts, from a utilitarian perspective, the more effective strategy for reducing crime." Paul H. Robinson & John M. Darley, *The Utility of Desert,* 91 Nw.U.L.Rev. 453, 454 (1997). "White collar" "victimless" offenses, such as the ones committed by these defendants, are harmful to all society, particularly since drugs are involved. It is important, therefore, that the imposition of a penalty in this case capture, to some rational degree, the "worth" of defendants' volitional criminal acts.

### 5. Sufficient But Not Greater Than Necessary

■ Mercy is seldom included on the list of "traditional" rationales for sentencing. It is, however, evinced by the federal sentencing statute, 18 U.S.C. § 3553(a), which provides, as noted above, that the lowest possible penalty consistent with the goals of sentencing be imposed. *See also United States v. Johnson,* 964 F.2d 124, 125 (2d Cir.1992) ("the United States Sentencing Guidelines do not require a judge to leave compassion and common sense at the door to the courtroom").

The notion that undue harshness should be avoided by those sitting in judgment has long been a part of the human fabric and spirit. Lenity is often the desirable route.

### C. Departures

To impose the harsh sentence suggested by Probation and the government under the

Guidelines without appropriate downward departures would amount to an act of needless cruelty given the nature of the crimes committed and the personal circumstances of these defendants. Reasoned application of both sets of philosophical considerations—just desert and utilitarian—lead to amelioration.

### 1. *Not a Heartland Case*

■ This case is outside of the heartland of racketeering and money laundering conspiracy cases contemplated by the Guidelines. *See Koon v. United States*, 518 U.S. at 92–93, 116 S.Ct. 2035; *see also United States v. Gamez*, 1 F.Supp.2d at 183 (E.D.N.Y. 1998). Under such circumstances the law requires the exercise of a large degree of discretion as bridled and channeled by the sentencing statutes and Guidelines.

Unlike those in most prosecutions in drug money laundering cases, the acts of these defendants were not ones of pure personal greed or avarice. While their manner of living did greatly improve with the receipt of their drug-tainted income, their state of mind was one that was much more complicated—driven largely by excessive artistic pride. So obsessed were defendants with creating art that they lost sight of reality. Abandoned was their previously unblemished law abiding life. In exchange for professional glory and economic freedom to create, they chose to live by the credo of the Cali drug cartel. Cf. Irving Stone, *The Agony and the Ecstacy* (New American Library 1996) (Medici family's support to Michelangelo); *see also* Robert Coughlan, *The World of Michelangelo: 1475–1564* 35–62 (1966) (same). Unfortunately for these defendants, in our world Mephistophelian deals are circumscribed by the law.

The unique motivations behind their crimes do make defendants' acts somewhat different from those in the mainstream of criminality. While still morally culpable, the state of mind of these defendants must be taken into account when considering the various rationales behind criminal penalties. Because this and other factors "distinguish[] the case from the 'heartland' cases covered by the guidelines in a way that is important to

the statutory purposes of sentencing," departure is encouraged. U.S.S.G. § 5K2.0.

### 2. *Vulnerability of Blarek and Pellecchia*

The defendants are homosexual lovers in a case that has been broadly publicized. The sexual proclivity of these men will likely be well known to fellow inmates and others in the correctional facilities. Their status will, no doubt, increase their vulnerability in prison.

The Guidelines purport to prohibit sex from being taken into account in the determination of a sentence. *See* U.S.S.G. § 5H1.10. No mention is made of sexual orientation. *See id.* Sexual orientation as a basis for departure has been questioned on constitutional grounds. *See United States v. Lara*, 905 F.2d 599, 603 (2d Cir.1990) ("That the district court did not base its sentence upon the defendant's bisexual orientation is of some significance because to have done so might have raised serious constitutional concerns."); *see also United States v. Wilke*, 1 F.Supp.2d at 829–30 (N.D.Ill.1998) (collecting cases indicating "one's status as a member of a particular group ... cannot alone provide sufficient reason for departure from the otherwise applicable guideline range").

■ While sexual orientation may not be an appropriate ground for departure, related ancillary issues presented in some such cases support a reduction in sentence. The reality is that homosexual defendants may need to be removed from the general prison population for their own safety. This would amount to a sentence of almost solitary confinement, a penalty more difficult to endure than any ordinary incarceration. *See, e.g., United States v. Lara*, 905 F.2d at 603 ("severity of [defendant's] prison term is exacerbated by his placement in solitary confinement as the only means of segregating him from other inmates").

There is ample authority for the proposition that the likelihood of a defendant's being abused while in prison supports a downward departure. *See Koon v. United States*, 518 U.S. at 111–12, 116 S.Ct. 2035 (departure based upon "susceptibility to abuse in pris-

on"); *United States v. Gonzalez,* 945 F.2d 525, 527 (2d Cir.1991) (departure based upon defendant's small frame and feminine looks resulting in extreme vulnerability in prison); *United States v. Lara,* 905 F.2d at 605 ("Extreme vulnerability of criminal defendants is a … proper ground for departure under § 3553(b)."); *United States v. Ruff,* 998 F.Supp. at 1359 (M.D.Ala.1998) (combined cumulative effect of defendant's "status as a gay man, an effeminate man, [and] survivor of sexual abuse" on his vulnerability in prison called for departure); *United States v. Wilke,* 995 F.Supp. at 829–30 (N.D.Ill.1998) (defendant's "sexual orientation and his passive, meek demeanor" exposing him to assault while in custody supported reduction in sentence); *United States v. Shasky,* 939 F.Supp. 695, 696 (D.Neb.1996) (outside of the heartland in part because defendant was "unusually susceptible to abuse in prison"). Because these defendants will be especially vulnerable to abuse in prison given their sexual orientation as well as their demeanor and build, downward departure is warranted.

### 3. *Pellecchia's Medical Condition*

■ Defendant Pellecchia is HIV positive and has been for fifteen years. While he currently appears to be in stable condition and has not developed discernable AIDS related symptoms, there is no question that this defendant suffers from a serious medical condition. *See* Reid J. Schar, Comment, *Downward Sentencing Departures for HIV–Infected Defendants: An Analysis of Current Law and a Framework for the Future,* 91 Nw.U.L.Rev. 1147, 1154 (1997) ("although the [HIV-positive] individual may feel fine, the infected patient is capable of spreading the disease and the patient's immune system is deteriorating"). This defendant has an extraordinary and unpredictable impairment. *See* U.S.S.G. § 5H1.4 ("extraordinary physical impairment may be a reason to impose a sentence below the applicable guidelines range").

Defendant represents that much of his relative well-being is attributable to a special regimen to which he has adhered. He has maintained a strict diet, exercised regularly, received acupuncture frequently, and taken a combination of vitamins and other natural supplements under the close supervision of a medical professional. Following a similar holistic plan within a correctional facility will likely be impossible. Federal prisons do provide appropriate medical care to those who are infected by HIV. *See United States v. Ruff,* 998 F.Supp. at 1355–57 (Bureau of Prisons official testified that federal institutions are capable of treating prisoners with AIDS). Nevertheless, there will be no substitute for his present living arrangements.

While the government may be correct that it can not be proven that defendant's unique treatment has contributed to his stable condition, defendant believes that it has. Since cruelty and its perception is as much a state of mind as a physical reality, he will suffer at least emotionally from the deprivation of his choice of treatment.

The extent to which inmates are exposed to diseases such as tuberculosis in prison is well documented. *See Departures for HIV–Infected Defendants, supra,* at 1156–57 ("The incidence of TB in prisons has recently been on the rise, and not surprisingly, those who tend to suffer most are HIV-infected prisoners."). Despite federal authorities' concern for prisoners' welfare, incarceration is likely to be detrimental to this defendant's health, resulting in a lessening of his present life expectancy. On this ground a reduction in defendant Pellecchia's sentence is required. *See United States v. Schein,* 31 F.3d 135, 138 (3d Cir.1994) (where a person is HIV-positive and may have related medical problems, departure may be warranted); *United States v. Streat,* 22 F.3d 109, 112–13 (6th Cir.1994) ("sections of the guidelines could justify a downward departure under certain circumstances" for persons with AIDS); *United States v. Hernandez,* 1991 WL 135635, at *1 (S.D.N.Y. Jul.12, 1991) (downward departure pursuant to U.S.S.G. § 5K1.2 granted for defendant diagnosed with AIDS); *see also United States v. Gigante,* 989 F.Supp. 436, 443 (E.D.N.Y.1998) ("Defendant's fragile

physical state, his advanced age, and a court's duty not to impose sentences that are excessively cruel argue strongly for a downward departure."). *But see United States v. Thomas,* 49 F.3d 253, 260–61 (6th Cir.1995) (no departure permitted unless HIV has developed into "advanced AIDS"); *United States v. Woody,* 55 F.3d 1257, 1275 (7th Cir.) (failure to grant a defendant's request for departure upheld where "no 'sound factual foundation' which would support a downward departure for his HIV positive condition" was presented to district court), *cert. denied,* 516 U.S. 889, 116 S.Ct. 234, 133 L.Ed.2d 163 (1995).

### 4. *Duress, Family Circumstances, and "Reduced Culpability"*

Defendants' requests for downward departure based upon duress, extraordinary family circumstances, and defendants' alleged "reduced culpability" are denied as unsupported by the facts.

### D. *Other Considerations*

 It is not clear what effect the conviction will have on the ability of these defendants to be licensed to practice their profession upon release from prison. Such collateral punishment is not an appropriate factor for mitigation in this case and need not be considered. *See, e.g., Koon v. United States,* 518 U.S. at 109–110, 116 S.Ct. 2035 (finding abuse of discretion where sentencing court determined defendants "career loss" took case outside of the heartland); *United States v. Rutana,* 932 F.2d 1155, 1158–59 (6th Cir.1991) (defendant's status as business with potential for loss of the business did not support downward departure), *cert. denied,* 502 U.S. 907, 112 S.Ct. 300, 116 L.Ed.2d 243 (1991); *United States v. Barone,* 913 F.2d 46, 50–51 (2d Cir.1990) (defendant's status as attorney and local judge standing alone did not support upward departure).

### E. *Individual Sentences*

The final task is weighing sentencing considerations already delineated, with particular emphasis on general deterrence and imposition of a punishment that can be viewed as deserved in light of the seriousness and danger to society of the crimes. While defendants have forfeited most of their property to the government via forfeiture and do deserve a downward departure from the Guidelines, a stiff fine to eliminate all their assets as well as a substantial period of incarceration is required.

#### 1. *Blarek*

 Blarek, whose actions indicate a somewhat greater culpability than do Pellecchia's, begins with a computed offense level of 32. For reasons already indicated, the sentence imposed should reflect a downward departure of six levels to offense level 26. Blarek is sentenced towards the lower end of the Guidelines' range for level 26 to a concurrent term of 68 months' incarceration for his conviction on the three counts. A lesser or greater departure would not be appropriate in view of the facts and law.

In addition, Blarek is fined a total of $305,-186, which represents his approximate total net worth after his forfeiture of over $2,000,-000 in cash and property to the government, and his payment of attorney's fees. *See* 18 U.S.C. §§ 1956(a)(1), 1963(a), and U.S.S.G. § 5E1.2(c)(4).

The maximum period of supervised release, three years, is imposed. U.S.S.G. §§ 5D1.1(a), 5D1.2(a)(2). During the time that defendant is under supervision, he may not work for any clients or employers outside of the United States to ensure that he is not tempted again into money laundering. A mandatory special assessment of $150 is also imposed. 18 U.S.C. § 3013(a)(2)(A) and U.S.S.G. § 5E1.3.

#### 2. *Pellecchia*

 Pellecchia's total offense level is computed at 30. The sentence should reflect a downward departure of seven levels to offense level 23. This represents the same six level departure granted for defendant

Blarek with an addition level of downward departure based upon defendant's health as well as his lesser culpability. A concurrent term of incarceration of 48 months, at the lower end of offense level 23, is imposed for his conviction on two counts. A lesser or greater departure would not be sufficient on the facts or the law.

No fine has been imposed for Pellecchia since he will have a negative net worth of over $100,000 after payment of attorney's fees.

Three years of supervised release is ordered. U.S.S.G. §§ 5D1.1(a), 5D1.2(a)(2). Like his co-defendant, Pellecchia may not be employed by anyone outside of this country during his period of supervision to minimize chances of his being tempted again into money laundering. A special assessment of $100 is also imposed. 18 U.S.C. § 3013(a)(2)(A) and U.S.S.G. § 5E1.3.

## V. *Conclusion*

Defendants' money laundering, racketeering, and interstate travel in aid of racketeering did not involve weapons, direct physical injury to victims, or the taking of a life. Yet, these are serious crimes that have induced talented and intelligent individuals, including many business people, to enter the drug-trafficking world.

Blarek and Pellecchia did not aspire to become criminals, but they allowed themselves to be lured into felonies by the promise of prestige and money. The sentences imposed follow statutory and case law mandates requiring these defendants to be treated harshly, primarily to deter others.